PEOPLE v KRIS ALDRICH
PEOPLE v KYALL ALDRICH

Docket No. 216402, 216403. Submitted August 9, 2000, at Lansing. Decided May 18, 2001, at 9:05 A.M. Leave to appeal sought.

Kris M. Aldrich and Kyall W. Aldrich were convicted by a jury in the Saginaw Circuit Court, Patrick M. Meter, J., of involuntary manslaughter. Kris Aldrich, a fourth-offense habitual offender, was sentenced to fifteen to thirty years of imprisonment. Kyall Aldrich received the same sentence, but as a third-offense habitual offender. The defendants originally had been charged in the alternative with second-degree murder or involuntary manslaughter after fifteen-year-old Jennifer Fear, a passenger in an automobile driven by Kris Aldrich, died in a collision between Kris Aldrich's automobile and an automobile occupied by Melissa and Sherry Musick. Kris Aldrich's automobile had failed to stop at a stop sign and yield the right of way to the Musicks' automobile. Kyall Aldrich, driving a pickup truck, had been behind Kris Aldrich's automobile but had stopped at the stop sign. The prosecution's theory of the case at trial was that the Aldriches were drag racing on a two-lane road while intoxicated, with Kris Aldrich driving in the lane meant for oncoming traffic. The defendants denied that they were drag racing, and Kris Aldrich testified that the brakes on his automobile failed. The defendants appealed and their appeals were consolidated.

The Court of Appeals *held*:

1. Kyall Aldrich, by withdrawing an objection at trial to the presentation of testimony concerning a police officer's speed calculations, failed to preserve for appeal his claim that the prosecutor engaged in misconduct in presenting the testimony inasmuch as the prosecutor should have known that the officer would give invalid information.

2. The prosecutor's failure to provide the defendants with a statistical report prepared by Sergeant William Brandt of the Michigan State Police using the Win Crash computer program did not constitute a discovery violation. Sgt. Brandt had disregarded the report because the program generated an error message indicating that the results were invalid given the data entered by Brandt. Material

evidence was not suppressed. The defendants were not denied a fair trial by the prosecutor's failure to provide them with a report containing invalid information.

3. To the extent that the prosecutor implied during closing argument that the defendants had sexual designs on the victim, the prosecutor's remarks were not improper. The prosecutor merely summarized the facts in evidence and encouraged the jury to draw reasonable inferences from those facts.

4. The trial court did not abuse its discretion in admitting evidence that indicated that the Musicks had to be rescued from their burning automobile after the collision. The evidence was relevant to the issue of the defendants' recklessness, and its probative value was not outweighed by the danger of unfair prejudice.

5. The trial court did not abuse its discretion in admitting into evidence postaccident photographs of Kris Aldrich's automobile and the victim. The photographs were offered to aid witnesses in their description of the conditions of the victim and the automobile following the accident.

6. The results of blood alcohol tests performed on the defendants' blood were properly admitted by the trial court pursuant to MCL 257.625a(6)(e). Subsection 625a(6)(e) provides that if, after an accident, the driver of a vehicle involved in the accident is transported to a medical facility and a sample of the driver's blood is withdrawn at the time for medical treatment, the results of a chemical analysis of that sample are admissible in any civil or criminal proceeding to show the amount of alcohol or presence of controlled substance or both in the person's blood. The defendants' claim that the results of their blood alcohol tests were inadmissible because the defendants were not under arrest at the time of the tests is rejected. By its plain terms, subsection 625a(6)(e) does not require that the subject of the test be under arrest. Testimony at trial indicated that the defendants' tests were performed for medical reasons. Kyall Aldrich was involved in the accident for purposes of subsection 625a(6)(e) because, even though his vehicle did not enter the intersection and strike another vehicle, his conduct was connected to the accident in a natural and logical manner.

7. The trial court did not err in denying the defendants' motions for directed verdicts of acquittal of the charges of second-degree murder. Contrary to the defendants' contention, there was sufficient evidence of malice to support the charges of second-degree murder. Malice can be inferred from evidence that the defendants intentionally set in motion a force likely to cause death or great bodily harm. Here, there was evidence that the defendants intentionally committed an act, drag racing into an intersection while

intoxicated, that was in disregard of life-endangering consequences and that was in wanton and wilful disregard of the likelihood that the natural tendency of such behavior was to cause death or great bodily harm.

8. None of the jury instruction errors asserted by the defendants require reversal of the defendants' convictions. The instructions the trial court gave regarding abandonment substantially covered the instructions that the defendants requested and did not seriously impair their ability to effectively present a defense. Kris Aldrich did not request an instruction regarding intervening cause (brake failure) and the trial court's failure to give such an instruction did not amount to plain error affecting Kris Aldrich's substantial rights. With regard to Kyall Aldrich's claim that the trial court erred in failing to give his requested instruction concerning intervening cause, the instruction given adequately covered the substance of the requested instruction. The trial court's instruction that Kyall Aldrich's mere presence was not enough to implicate him in the crime, and that his responsibility for the victim's death required that it have resulted from "common" unlawful activity accompanied by the required intent element, covered the defense theory that Kyall Aldrich was not participating in a drag race at the time of the fatal collision. Kyall Aldrich was not prejudiced by the trial court's failure to instruct with regard to the uncharged offense of furnishing alcohol to a minor.

9. Kris Aldrich's sentence is not excessive because it is proportionate to the seriousness of the crime and his prior record.

Affirmed.

WHITBECK, J., concurring, wrote separately to explain why Kris Aldrich is not entitled to a new trial on the asserted ground that the prosecutor committed a discovery violation in not providing the defendants with Sgt. Brandt's Win Crash analysis. To be entitled to a new trial on the basis of a prosecutor's suppression of evidence, a defendant must demonstrate that the state possessed evidence favorable to the defendant, that the defendant did not possess the evidence and could not have obtained it with any reasonable diligence, that the prosecutor suppressed the favorable evidence, and that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. The evidence allegedly suppressed must be viewed in the context of the trial, with materiality determined from the role the evidence would have played at trial had the defense known of its existence and had access to it. In this case, Sgt. Brandt's Win Crash analysis never actually produced a valid result because the Win Crash program relies on measurements of vehicular travel on

the ground, Sgt. Brandt estimated ground measurements for the portion that Kris Aldrich's automobile was airborne over a ditch, and the program generated an error message indicating that the resultant calculated speed was invalid and that the program should be rerun. Thus, Sgt. Brandt's Win Crash analysis was not material to the fairness of the trial and the prosecutor's failure to provide the defendants with the analysis did not constitute a suppression of evidence that warrants the grant of a new trial.

1. PROSECUTING ATTORNEYS — IMPROPER REMARKS AT TRIAL — APPEAL.

The Court of Appeals, when reviewing a preserved claim of improper remarks by a prosecutor at a trial, examines the remarks in context and determines whether the defendant was denied a fair and impartial trial; where a defendant fails to object at trial to a claimed improper remark by a prosecutor, the issue is reviewed for plain error that affected the defendant's substantial rights.

2. PROSECUTING ATTORNEYS — ARGUMENTS AT TRIAL.

A prosecutor need not confine arguments at trial to the blandest of all possible terms, but may comment on the evidence and encourage the jury to draw reasonable inferences from the evidence.

3. EVIDENCE — ADMISSIBILITY — APPEAL.

A party opposing the admission of evidence and seeking to preserve the evidentiary issue for appellate review must object at trial and specify the same ground for objection that it asserts on appeal (MRE 103[a][1]).

4. EVIDENCE — ADMISSIBILITY — APPEAL.

The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion; an abuse of discretion is found only if an unprejudiced person, considering the facts on which the trial court acted, would say that there was no excuse for the ruling made; a decision on a close evidentiary question cannot be an abuse of discretion.

5. EVIDENCE — ADMISSIBILITY — RELEVANCE.

Generally, all relevant evidence is admissible at trial; evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence; however, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence (MRE 401).

6. CRIMINAL LAW — EVIDENCE — MOTIONS FOR SUPPRESSION — APPEAL.

A reviewing court may not disturb a trial court's ruling at a suppression hearing unless that ruling is clearly erroneous; where a trial court's decision concerned a mixed question of fact and law, the court's findings are reviewed for clear error, while its application of the law to the facts is reviewed de novo; where an evidentiary decision lies within the trial court's discretion, review is for abuse of discretion.

7. INTOXICATING LIQUORS — AUTOMOBILE ACCIDENTS — BLOOD ALCOHOL TEST OF DRIVERS.

A driver of an automobile engaged in a drag race with another automobile that has a collision with a third automobile not involved in the race is a driver involved in the accident for purposes of the statute that provides that the results of a chemical analysis of a sample of blood withdrawn for medical treatment of an automobile driver involved in an accident is admissible in any civil or criminal proceeding to show the amount of alcohol or the presence of a controlled substance in the driver's blood (MCL 257.625a[6][e]).

8. CRIMINAL LAW — TRIAL — DIRECTED VERDICTS — APPEAL.

The Court of Appeals, in an appeal from a trial court's ruling on a motion for a directed verdict, reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt.

9. HOMICIDE — SECOND-DEGREE MURDER.

The offense of second-degree murder consists of a death caused by an act of the defendant with malice and without justification or excuse (MCL 750.317).

10. HOMICIDE — SECOND-DEGREE MURDER — MALICE.

Malice sufficient to support a conviction of second-degree murder can be inferred from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm; second-degree murder does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences (MCL 750.317).

11. CRIMINAL LAW — JURY INSTRUCTIONS — APPEAL.

Jury instructions are reviewed on appeal in their entirety to determine if error requiring reversal occurred; even if the instructions are somewhat imperfect, reversal is not required as long as the instructions fairly presented the issues to be tried and sufficiently protected the defendant's rights.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Michael D. Thomas*, Prosecuting Attorney, and *Janet M. Boes*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *C. Joseph Booker*), for Kris M. Aldrich.

*William A. Brisbois*, for Kyall W. Aldrich.

Before: M. J. KELLY, P.J., and WHITBECK and COLLINS, JJ.

M. J. KELLY, P.J. Defendants Kris M. Aldrich and Kyall W. Aldrich were originally charged with second-degree murder, MCL 750.317, and, alternatively, with involuntary manslaughter or manslaughter committed with a motor vehicle, MCL 750.321. Following a jury trial, both defendants were convicted of involuntary manslaughter. Kris Aldrich was sentenced as an habitual offender, fourth offense,[1] to fifteen to thirty years' imprisonment. Kyall Aldrich was sentenced as an habitual offender, third offense,[2] to fifteen to thirty years' imprisonment. Defendants now appeal as of right. Their appeals have been consolidated for review. We affirm.

I. FACTS

Defendants' involuntary manslaughter convictions stem from a two-car collision that occurred during a drag race between defendants, who are brothers,[3] on

---

[1] MCL 769.12.

[2] MCL 769.11.

[3] Kyall was twenty-one years old at the time of the incident in question. Kris was twenty years old.

the evening of May 6, 1998. The victim was a fifteen-year-old girl, Jennifer Fear, who was a passenger in Kris Aldrich's vehicle at the time of the collision. The prosecutor's theory of the case was that defendants picked up Jennifer, bought and consumed some whiskey, then went drag racing at speeds up to one hundred miles an hour, when defendant Kris Aldrich, with Jennifer in his vehicle, ran a stop sign and collided with another vehicle, causing Jennifer's death. Counsel for defendant Kris Aldrich conceded that defendants were drinking and engaging in "horseplay," including exceeding the speed limit, but argued that any reckless driving had ended at the time of the accident and that the accident was the result of brake failure. Defendant Kyall Aldrich also claimed that any reckless driving had ceased before the accident.

At trial, many witnesses testified that they observed defendants drag racing down a two-lane stretch of Roosevelt Road on May 6, 1998, at approximately 8:30 P.M. Defendants' vehicles[4] were racing side by side along Roosevelt Road, thereby occupying the whole roadway including the lane reserved for oncoming traffic. Kris Aldrich's vehicle was occupying the lane reserved for oncoming traffic. Witnesses indicated that the vehicles were traveling "extremely" fast, at speeds approaching ninety miles an hour. Kris Aldrich's vehicle was observed ducking in and out of the oncoming traffic lane to avoid colliding with vehicles traveling in the opposite direction.

The vehicles approached the intersection of Roosevelt and Hemlock.[5] There is a stop sign at this

---

[4] Kris Aldrich was driving a blue Beretta and Kyall Aldrich was driving a red pickup truck.

[5] This section of Roosevelt is gravel; Hemlock is paved.

intersection for vehicles traveling on Roosevelt Road; Hemlock has the right of way. Witnesses testified that the drag race was ongoing as the vehicles approached the intersection. Melissa Musick and her mother, Sherry Musick, were traveling along Hemlock Road approaching the intersection at Roosevelt Road. As they passed through the intersection, Kris Aldrich's Beretta failed to stop at the stop sign and collided with the Musicks' vehicle. The Musicks' vehicle spun out of control "and ended up upside down in the ditch, on fire."[6] Kris Aldrich's vehicle ended up in the field alongside the roadway. Jennifer Fear, the passenger in Kris Aldrich's vehicle, was killed in the accident and her body was found lying outside the Beretta.

Although Kyall Aldrich denied drag racing and told police that he had been driving 1½ miles behind his brother at the time of the accident, witnesses testified that defendants' vehicles were still engaged in the drag race just before the accident. In fact, witness Nicholas Scoles observed defendants' vehicles racing seconds before the accident occurred, just as the vehicles approached the intersection of Hemlock and Roosevelt Roads. Melissa Musick, the driver of the vehicle that collided with Kris Aldrich's vehicle, confirmed that in the seconds before the accident, defendants' vehicles were speeding along the roadway, side by side, although she admitted that Kyall Aldrich's vehicle did stop at the stop sign.

Kris Aldrich told police at the scene that Jennifer had been driving his vehicle at the time of the acci-

---

[6] Fortunately, onlookers were able to pull the Musicks from the burning vehicle. The Musicks were then transported to the hospital for treatment.

dent and that he was sitting in the back seat. He also told police that he could not remember if he had been drag racing. Neither defendant could remember where they were going when the accident occurred.

At trial, Kris Aldrich admitted that beginning around 7:00 P.M. on the night of the incident in question, he, Kyall, and Jennifer had been drinking whiskey mixed with Pepsi. At around 8:30 P.M., the three decided to go to Kyall's house. Kris and Jennifer took the Beretta, with Kris driving, and Kyall drove the red pickup truck. According to Kris, he was driving on Roosevelt at approximately fifty-five or sixty miles an hour. Kris testified that he attempted to pass Kyall's red pickup truck, but pulled back in behind Kyall when another vehicle appeared. Subsequently, Kyall slowed down to approximately twenty miles an hour and signaled for Kris to pull alongside him, and that the two conversed about stopping at a convenience store. Kris stated that he then "took off first and got in front of Kyall's car." Kris testified that as he approached the intersection, at approximately fifty miles an hour, he started to slow down for a stop sign, but that "the brake pedal went right to the floor and wasn't stopping no more." He then entered the intersection and collided with the vehicle being driven by Melissa Musick.[7]

After hearing the above evidence, the jury convicted both defendants of involuntary manslaughter.

---

[7] The prosecutor presented the rebuttal testimony of Gary Dudicz, an expert in the area of automobile mechanics (including brake systems), who testified that he had examined the Beretta and that the brakes should have been functioning properly at the time of the accident. Dudicz also testified that the vehicle had an adequate supply of brake fluid, that his inspection turned up no leaks, and that the brake pads were fairly new and in good condition.

Defendants received fifteen- to thirty-year sentences.
They appeal as of right.

## II. PROSECUTORIAL MISCONDUCT

### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

This Court reviews claims of prosecutorial miscon-
duct case by case, examining the remarks in context,
to determine whether the defendant received a fair
and impartial trial. *People v Bahoda,* 448 Mich 261,
266-267; 531 NW2d 659 (1995). Concerning preserved
issues of prosecutorial misconduct, this Court evalu-
ates the challenged conduct in context to determine if
the defendant was denied a fair and impartial trial.
*People v Truong (After Remand),* 218 Mich App 325,
336; 553 NW2d 692 (1996). Where a defendant fails to
object to an alleged prosecutorial impropriety, the
issue is reviewed for plain error. *People v Carines,*
460 Mich 750, 752-753, 764; 597 NW2d 130 (1999); *Peo-
ple v Schutte,* 240 Mich App 713, 720; 613 NW2d 370
(2000). Thus, to avoid forfeiture of the issue, defen-
dant must demonstrate plain error that affected his
substantial rights, i.e., that affected the outcome of
the proceedings. *Carines, supra* at 763-764; *Schutte,
supra* at 720.

### B. PRESENTATION OF DEPUTY KEVIN CAMPBELL'S TESTIMONY

Defendant Kyall Aldrich argues that it was
improper for the prosecutor to present the testimony
of Deputy Kevin Campbell because the prosecutor
should have known that Deputy Campbell would

present invalid information.[8] Specifically, Kyall points
to Deputy Campbell's concession on cross-exami-
nation that certain ambiguities attended his speed cal-
culations. Kyall also points to the prosecutor's presen-
tation of Sergeant William Brandt of the Michigan
State Police, whose opinions concerning speed con-
tradicted those of Campbell. However, Kyall with-
drew his objection to the presentation of Deputy
Campbell's testimony because he wanted to refer to
Deputy Campbell's speed calculations during closing
argument.[9] He has, therefore, waived this claim of
error on appeal. A defendant may not waive objection
to an issue before the trial court and then raise the
issue as an error on appeal. *People v Fetterley*, 229
Mich App 511; 583 NW2d 199 (1998).

### C. PROSECUTOR'S DUTY TO DISCLOSE EVIDENCE

After trial had commenced in this matter, Sgt.
Brandt generated a statistical report by using the Win
Crash computer program. The last page of the report
contained an error message, indicating that the
results contained in the report were not valid. Sgt.
Brandt never provided the prosecutor with a copy of
the invalid report.

A prosecutor has a duty to "make timely disclosure
to the defense of all evidence or information known
to the prosecutor that tends to negate the guilt of the
accused or mitigates the degree of the offense[.]"
MRPC 3.8(d). There is no dispute in this case that any

---

[8] Defendant Kris Aldrich does not challenge the prosecution's presenta-
tion of Deputy Campbell's testimony on appeal.

[9] During closing argument, counsel for Kyall Aldrich referred to Deputy
Campbell's testimony in arguing to the jury that the prosecution's case
was weak.

reports or test results prepared for the case by law enforcement officers were subject to discovery. However, Sgt. Brandt's attempt to generate an accurate report in this case was unsuccessful. There is no dispute that the computer printout contained invalid test results and was therefore disregarded by Sgt. Brandt. Hence, it seems the prosecutor's witness did not suppress material evidence. Instead, he disregarded invalid evidence. In any event, we cannot see how defendants were denied a fair trial by the prosecutor's failure to provide them with a report containing invalid information.

### D. CLOSING ARGUMENT

Defendants challenge the prosecutor's implication during closing argument that they had sexual designs on the victim on the evening of the incident in question. Defendants did not object to the prosecutor's remarks below. A review of the prosecutor's remarks, in context, reveals that the prosecutor was merely summarizing the facts in evidence and encouraging the jury to draw reasonable inferences from those facts. This was not improper. A prosecutor need not confine argument to the "blandest of all possible terms," but has wide latitude and may argue the evidence and all reasonable inferences from it. *People v Marji*, 180 Mich App 525, 538; 447 NW2d 835 (1989); *Bahoda, supra* at 282. Because the prosecutor's remarks were not improper, defendants have failed to show plain error affecting their substantial rights. *Carines, supra* at 763-764.

### III. EVIDENTIARY ISSUES

#### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal. MRE 103(a)(1); *People v Grant*, 445 Mich 535, 545, 553; 520 NW2d 123 (1994); *People v Griffin*, 235 Mich App 27, 44; 597 NW2d 176 (1999). On the basis of the objections made by defendants at trial, it appears, unless indicated later in this opinion, that the evidentiary issues raised by defendants are preserved for appellate review. The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998), reh den 459 Mich 1203 (1998). An abuse of discretion is found only if an unprejudiced person, considering the facts on which the trial court acted, would say that there was no excuse for the ruling made. *People v Snider*, 239 Mich App 393, 419; 608 NW2d 502 (2000). A decision on a close evidentiary question ordinarily cannot be an abuse of discretion. *People v Sabin (After Remand)*, 463 Mich 43, 67; 614 NW2d 888 (2000).

#### B. PHOTOGRAPH OF THE VICTIM AND EVIDENCE OF THE MUSICKS' RESCUE

Defendants claim that the prosecutor's repeated reliance on the photograph of the decedent and reference to the Musicks' burning vehicle and their rescue contributed nothing to the jury's inquiry and served only to prejudice defendants.

At a pretrial hearing regarding the admissibility of evidence of the Musicks' burning vehicle and evidence of heroic rescue efforts by onlookers that resulted in the Musicks being pulled from their burning vehicle, the trial court ruled that the evidence was relevant because it demonstrated the "force and violence" of the collision and could assist the jury in assessing defendants' recklessness in the incident. The court additionally ruled that the probative value of the evidence was not substantially outweighed by any possible prejudice. However, the court cautioned the prosecutor against "overusing" the evidence.

Generally, all relevant evidence is admissible at trial. *Starr, supra* at 497. Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence. MRE 401; *People v Crawford*, 458 Mich 376, 388; 582 NW2d 785 (1998). Under this broad definition, evidence is admissible if it is helpful in throwing light on any material point. *People v Kozlow*, 38 Mich App 517, 524-525; 196 NW2d 792 (1972). However, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. *Sabin, supra* at 57-58.

We agree with the trial court that evidence regarding the condition of the Musicks' vehicle was relevant to the jury's determination of facts at issue in this case such as defendants' recklessness or carelessness and the speed of the vehicles at the time of the impact. Moreover, defendants have not convinced us that the relevancy of the evidence was substantially

outweighed by any prejudicial effect or that they were prejudiced by the cumulative nature of the evidence.

With regard to the evidence of the Musicks' rescue from the burning vehicle, a jury is entitled to hear the "complete story" of the matter in issue. *People v Sholl,* 453 Mich 730, 742; 556 NW2d 851 (1996), reh den 454 Mich 1211 (1997); *People v Delgado,* 404 Mich 76, 83; 273 NW2d 395 (1978). It would have been perplexing to the jury to learn that a violent two-car collision had occurred but not what became of the occupants of one of the vehicles. In any event, defendants have not demonstrated that they were prejudiced by the admission of evidence, from several sources, concerning the Musicks' rescue from their vehicle after the collision. This evidence did not bear on defendants' guilt or innocence.

With regard to Kris Aldrich's unpreserved challenge to the admissibility of the photographs of the victim and Kris' damaged vehicle, we have reviewed the photographs in question and conclude that they are neither shocking nor inherently prejudicial. Nor does it appear from the record that the photographs were offered with the intention of inflaming the jury. *People v Hall,* 83 Mich App 632; 269 NW2d 476 (1978). The photographs were offered to aid witnesses in their description of the victim's condition at the accident scene as well as the condition of Kris' vehicle after the collision, both matters that were relevant to physical facts. Any prejudice resulting from the use of the photographs did not substantially outweigh their probative value. MRE 403. It appears that the photographs would have aided the jury in explaining and comprehending all circumstances of the incident. See

*People v Schmitz*, 231 Mich App 521, 534; 586 NW2d 766 (1998). We find no error in the trial court's admission of the challenged photographs.

### IV. ADMISSIBILITY OF BLOOD ALCOHOL TEST RESULTS

#### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal. MRE 103(a)(1); *Grant, supra* at 545, 553; *Griffin, supra* at 44. On the basis of the objections made by defendants at trial, it appears unless indicated later in this opinion, that the evidentiary issues raised by defendants are preserved for appellate review.[10] A reviewing court may not disturb a trial court's ruling at a suppression hearing unless that ruling is clearly erroneous. *People v Burrell*, 417 Mich 439, 448; 339 NW2d 403 (1983). Where a trial court's decision concerned a mixed question of fact and law, the court's findings are reviewed for clear error, while its application of the law to the facts is reviewed de novo. *People v Barrera*, 451 Mich 261, 269; 547 NW2d 280 (1996). Where an evidentiary decision lies within the trial court's discretion, the court's exercise of that discretion is reviewed for an abuse of discretion. *Bahoda, supra* at 288.

---

[10] Kris Aldrich moved to suppress the blood alcohol test results on the ground that there was a delay between the accident and the blood alcohol test. Kyall Aldrich argued below that because he was not involved in the accident in question, his blood alcohol test results were inadmissible at trial.

B. MCL 257.625a(6)(e)

Defendants raise various claims regarding the admissibility of their blood alcohol test results, including claims of statutory construction involving MCL 257.625a(6)(e). The primary rule of statutory construction is to ascertain and give effect to the intent of the Legislature. *People v Borchard-Ruhland,* 460 Mich 278, 284; 597 NW2d 1 (1999). To determine the Legislature's intent, we first examine the language of the statute. *Id.* "If the language of the statute is unambiguous, the statute should be applied as written and judicial construction is not permitted. However, if the statutory language is ambiguous, a court may go beyond the words of the statute to determine the Legislature's intent." *People v Oliver,* 242 Mich App 92, 96; 617 NW2d 721 (2000).

To the extent that defendants claim that the results of their blood alcohol tests were inadmissible because defendants were not under arrest at the time their blood alcohol levels were tested, we reject that claim. Section 625a of the Vehicle Code, MCL 257.625a, reads in pertinent part as follows:

   (6) The following provisions apply with respect to chemical tests and analysis of a person's blood . . .

                     *       *       *

   (e) If, after an accident, the driver of a vehicle involved in the accident is transported to a medical facility and a sample of the driver's blood is withdrawn at that time for medical treatment, the results of a chemical analysis of that sample are admissible in any civil or criminal proceeding to show the amount of alcohol or presence of a controlled substance or both in the person's blood at the time alleged, regardless of whether the person had been offered or had

refused a chemical test. The medical facility or person performing the chemical analysis shall disclose the results of the analysis to a prosecuting attorney who requests the results for use in a criminal prosecution[.]

Our Supreme Court recently ruled that "only persons who have been arrested fall within the purview of the implied consent statute." *Borchard-Ruhland*, *supra* at 285, citing MCL 257.625c and 257.625a(6)(b). However, the Court was construing the provision of the statute that sets forth the presumption of consent to testing, § 625c, and the provision that establishes the notice rights of the suspect, subsection 625a(6)(b), both of which expressly concern only persons who have been "arrested." In contrast, subsection 625a(6)(e) does not mention arrest, and it provides for the admissibility of blood alcohol test results in any "civil or criminal proceeding," where the blood on which the test was run was drawn "for medical treatment" from a driver "involved in" an accident. By its plain terms, therefore, subsection 6(e) concerns tests done on blood drawn not for legal responsibility reasons, but for medical purposes, and is not limited to those under arrest.

Next, defendants claim that their blood alcohol test results were inadmissible under subsection 625a(6)(e) because the prosecutor failed to prove that the blood tests in the instant case were conducted for medical treatment. Defendants failed to raise this issue below. Because they failed to raise the issue at trial, this issue is not preserved for appellate review. *People v Morey*, 230 Mich App 152, 163; 583 NW2d 907 (1998), aff'd 461 Mich 325; 603 NW2d 250 (1999). Regardless, it appears from the testimony presented at trial that the medical procedures performed on defendants,

including the withdrawing of their blood, were done for medical reasons.[11] In any event, even if the trial court erred in admitting the defendants' blood alcohol test results, any error in this regard was harmless in light of the other evidence presented to indicate that defendants had been drinking before the collision, including Kris' own admission that he and Kyall had been drinking whiskey before the crash, and the fact that legal intoxication is not an element of the charges against defendants.

Finally, Kyall claims that because he was not "involved in" the accident, i.e., his vehicle did not come into contact with the Musicks' vehicle, his blood alcohol tests were inadmissible under subsection 625a(6)(e). A similar claim was rejected by this Court in *Oliver, supra* at 96-98. In *Oliver*, the defendant, driving a Jeep Wagoneer, was pushing a small Honda driven by his friend down the westbound lane of US-12. The defendant's Jeep would bump the Honda, which would then coast along for awhile. When the Honda would slow down, the Jeep would again bump the Honda. After being bumped by the Jeep, the Honda driver lost control of the Honda, veered into the path of oncoming traffic, and stuck

---

[11] We note that Kris makes no argument concerning foundational requirements, or the alleged lack thereof, or concerning the lapse of time between the accident and the blood alcohol test, perhaps eschewing those lines of argument in light of *People v Wager*, 460 Mich 118; 594 NW2d 487 (1999), and *People v Campbell*, 236 Mich App 490; 601 NW2d 114 (1999). To the extent that Kyall claims on appeal that his blood alcohol test was not performed within a reasonable time, we note that our Supreme Court has recently ruled that for purposes of admitting the results of blood alcohol tests performed on a driver, there is no requirement that such tests be given within a reasonable time. *Wager, supra* at 122-124. The delay of approximately 3½ hours between the accident and the test bears on the weight of the evidence, not its admissibility.

another vehicle, killing its driver. The defendant
stopped off the highway, put his head out of the win-
dow, looked back toward the accident, and then
drove off, hiding his Jeep behind a friend's shed. He
was subsequently discovered and charged with failure
to stop at an accident involving serious injury, MCL
257.617.

On appeal, the defendant argued that he was not
"involved in" the accident, as required by subsection
617(1), "because his vehicle was not in contact with
the Honda when the Honda swerved onto the right
shoulder immediately before it veered into the east-
bound lane and struck the decedent's vehicle." *Oliver*,
*supra* at 96. This Court rejected the defendant's
claim:

> [W]e reject defendant's contention that a vehicle cannot
> be "involved in" an accident if it does not strike or physi-
> cally touch another automobile. There are no reported
> cases in this state that construe the phrase "involved in" as
> it is used in MCL 257.617(1); MSA 9.2317(1). Our construc-
> tion of that phrase is governed by the rules of statutory
> construction.
>
> *      *      *
>
> The phrase "involved in" is not defined in the statute.
> Therefore, we look to a dictionary for its definition. The rel-
> evant dictionary definitions of "involved" include "impli-
> cated," and "concerned in some affair, esp. in a way likely
> to cause danger or unpleasantness." *Random House Web-
> ster's College Dictionary* (2d ed, 1997). According to the
> plain meaning of the term "involved," defendant's conduct
> falls within MCL 257.617(1); MSA 9.2317(1). The prosecutor
> presented evidence that defendant's Jeep pushed the
> Honda, which could not run on its own power, down the
> highway at approximately fifty-seven miles an hour. The
> driver of a vehicle traveling behind defendant's Jeep testi-
> fied that he witnessed the Jeep strike the rear bumper of

the Honda just before the Honda began to veer off the road and out of control. Alexander testified that it was the impact of defendant's Jeep that caused him to begin to lose control of the Honda.

The evidence indicated that defendant clearly played a part in the accident despite the fact that his vehicle did not strike or come into contact with another vehicle. We conclude that defendant was "involved in" the accident because the evidence demonstrated that he was implicated in or connected with the accident in a logical or substantial manner . . . . Defendant need not have caused the accident in order to have been "involved in" the accident. [*Oliver, supra* at 96-98 (citations omitted).]

Although the *Oliver* Court construed the phrase "involved in" contained in another provision of the Vehicle Code, the statute addressing the failure to stop at a serious injury accident, MCL 257.617(1), the reasoning and analysis contained in *Oliver* applies with equal force to the term "involved in" contained in subsection 625a(6)(e). We, therefore, adopt the *Oliver* Court's analysis.[12] Like the defendant in *Oliver*,

---

[12] We acknowledge the holding in *Robinson v Detroit*, 462 Mich 439, 456-457, 468; 613 NW2d 307 (2000), reh den 463 Mich 1211 (2000). In *Robinson*, a case involving liability for injuries sustained as a result of a police chase of a fleeing vehicle, our Supreme Court construed the motor vehicle exception to governmental immunity, MCL 691.1405. The motor vehicle exception requires that a plaintiff's injuries "result from" the negligent operation of a government vehicle. The *Robinson* Court, without much elaboration, determined that the plaintiffs could not satisfy the "resulting from" language of the statute "where the pursuing police vehicle did not hit the fleeing car or otherwise physically force it off the road into another vehicle or object." *Robinson, supra* at 456-457, 468. *Robinson* is distinguishable from the present case. The *Robinson* decision narrowly construed the motor vehicle exception to governmental immunity and involved police chases of fleeing vehicles and the issue of liability for injuries that resulted. Here, the issue is whether, under the Vehicle Code, Kyall was "involved in" an accident even though his vehicle did not come into contact with the Musicks' vehicle. For the reasons set forth above, we believe that Kyall was "involved in" the accident. *Oliver, supra* at 96-98.

Kyall Aldrich in this case clearly played a part in the accident at issue despite the fact that his vehicle did not strike or come into contact with the Musicks' vehicle. The prosecutor presented evidence to indicate that in the seconds before the accident, defendants' vehicles continued to be engaged in a high-speed drag race. In fact, in the seconds before the collision, defendants' vehicles were speeding along side by side down Roosevelt Road, thereby occupying the whole roadway including the lane reserved for oncoming traffic. Even though Kyall's vehicle did stop at the stop sign at the intersection of Roosevelt and Hemlock Roads, he was involved in the accident because his conduct was connected to the accident in a natural and logical manner. In fact, had defendants not been engaged in a high-speed drag race, this accident would never have occurred. In light of the *Oliver* decision, Kyall's claim that he was not involved in the accident must fail.

V. DIRECTED VERDICT

A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

At the close of the prosecution's case, defendants moved for directed verdicts on the second-degree murder charges, thus preserving this issue for appellate review. When reviewing a trial court's decision on a motion for a directed verdict, this Court reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt.

*People v Mayhew*, 236 Mich App 112, 124-125; 600 NW2d 370 (1999).

### B. SECOND-DEGREE MURDER

The offense of second-degree murder consists of the following elements: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *Id.*, quoting *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). Defendants claim that there was insufficient evidence regarding the element of malice. The element of malice is defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* at 464; *Mayhew, supra* at 125. Malice for second-degree murder can be inferred from evidence that the defendant "intentionally set in motion a force likely to cause death or great bodily harm." *People v Djordjevic*, 230 Mich App 459, 462; 584 NW2d 610 (1998). The offense of second-degree murder "does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences." *Mayhew, supra* at 125. See also *Goecke, supra* at 466. Here, there was evidence to indicate that defendants intentionally committed an act, drag racing at very high speeds into an intersection while intoxicated, that was in disregard of life-endangering consequences and that was in "wanton and wilful disregard of the likelihood that the natural tendency of such behavior [was] to cause death or great bodily harm." *Id.* at 464; *Mayhew, supra* at 125. See also *People v Vasquez*, 129 Mich App 691, 694; 341 NW2d 873

(1983). Although Kyall claims that he had ceased any reckless driving before the accident, the prosecutor presented evidence to indicate that the drag race continued up until seconds before the crash. It is the province of the jury to determine questions of fact and assess the credibility of witnesses. *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1998). Because there was evidence to infer the element of malice with regard to both defendants, the question was one for the jury. *Mayhew, supra* at 126.

In sum, viewing the evidence in a light most favorable to the prosecution, as we are constrained to do in this context, we believe that the evidence was sufficient for a rational trier of fact to find that the essential elements of second-degree murder, including malice, were proved beyond a reasonable doubt. *Id.*

### VI. JURY INSTRUCTIONS

#### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

We review jury instructions in their entirety to determine if error requiring reversal occurred. *People v Brown*, 239 Mich App 735, 746; 610 NW2d 234 (2000). The instructions must not be " 'extracted piecemeal to establish error.' " *Id.*, quoting *People v Caulley*, 197 Mich App 177, 184; 494 NW2d 853 (1992). Even if the instructions are somewhat imperfect, reversal is not required as long as they fairly presented the issues to be tried and sufficiently protected the defendant's rights. *Brown, supra* at 746. Defendants' claims of instructional error are, for the most part, preserved for appellate review. With regard to unpreserved claims of instructional error, this

Court reviews such claims for plain error that affected substantial rights. *Carines, supra* at 761-764, 774; *Snider, supra* at 420.

### B. ALLEGED INSTRUCTIONAL ERRORS

Defendants first claim that the trial court should have given their requested, modified abandonment instruction. We have reviewed the instructions in their entirety and conclude that the instructions given by the trial court substantially covered the instruction requested by defendants and the trial court's failure to give the abandonment instruction did not seriously impair defendants' ability to effectively present a given defense. *People v Moldenhauer*, 210 Mich App 158, 159-160; 533 NW2d 9 (1995).

With regard to Kris' claim that because there was evidence that he failed to stop at the stop sign because of brake failure, the trial court should have instructed the jury on intervening cause. Kris did not request such an instruction below and has not shown that the trial court's failure to give such an instruction amounted to plain error affecting Kris' substantial rights. *Carines, supra* at 761-764, 774. With regard to Kyall's claim that the trial court erred in failing to give his requested instruction on intervening cause, the instructions given adequately covered the substance of the instruction requested by Kyall. The trial court's instruction that Kyall's mere presence was not enough to implicate him in the crime, and that his responsibility for the victim's death required that it have resulted from "common" unlawful activity accompanied by the required intent element, covered the defense theory that Kyall was not participating in a drag race at the time of the fatal collision.

Having reviewed the jury instructions in their entirety, we do not believe that Kyall was prejudiced by the trial court's failure to instruct the jury on the uncharged offense of furnishing alcohol to a minor.

## VII. SENTENCING

Lastly, Kris Aldrich argues that his sentence for involuntary manslaughter is excessive. Provided that permissible factors are considered, appellate review of prison sentences is limited to whether the sentencing court abused its discretion. *People v Coles*, 417 Mich 523, 550; 339 NW2d 440 (1983), overruled in part on other grounds, *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990). A sentencing court abuses its discretion when it violates the principle of proportionality. A sentence must be proportionate to the seriousness of the crime and the defendant's prior record. *Milbourn, supra* at 635-636, 654. The senseless crime in this case resulted in the death of a fifteen-year-old girl. Defendant, therefore, committed a very serious offense. Moreover, defendant had a rather extensive criminal history for a twenty-year-old man. Under these circumstances, the sentence imposed for involuntary manslaughter, fifteen to thirty years, is proportionate to the seriousness of the crime and to defendant's prior record.

## VIII. CONCLUSION

Having found no error requiring reversal, we conclude that defendants' convictions and sentences must be affirmed.

COLLINS, J., concurred.

WHITBECK, J. *(concurring)*. I concur in the result the lead opinion reaches in both appeals. I write separately to explain why, in my opinion, Kris Aldrich is not entitled to a new trial after he learned that the police had produced a Win Crash analysis purportedly demonstrating that he was driving at a relatively low speed at the time of the crash in this case. Because the scientific, statistical, and engineering components of crime investigation grow ever more important in the way prosecutors try their cases, I analyze whether the prosecutor committed a discovery violation that entitles Kris Aldrich to a new trial with the hope that this analysis will prove useful in other cases.

### I. BASIC FACTS

To understand the potential discovery problem in this case requires understanding the defense theory and the nature of the Win Crash analysis at issue. Kris Aldrich claimed that the collision between the Chevrolet Beretta he was driving and the Chevrolet Lumina Melissa Musick was driving occurred at relatively low speeds because his brakes failed. Thomas Bereza, an accident reconstruction expert testifying for the defense, conducted a Win Crash analysis and concluded from the condition the Lumina was in following the crash, as well as from other evidence, that the highest possible speed Kris Aldrich's car could have been traveling at the time of impact was thirty-six miles an hour and that it was more likely that he was driving more slowly. The prosecutor elicited from his expert accident reconstruction witness, Sergeant William Brandt, that he had run the Win Crash analysis and that he could not determine the speed at which Kris Aldrich was driving at the time the colli-

sion occurred. During cross-examination, Joseph Scorsone, Kris Aldrich's lawyer, asked Sgt. Brandt about the Win Crash analysis:

> *Q:* [Y]ou, in fact, ran through the Win Crash program and came up with some results, is that [a] fair statement?
>
> *A:* I attempted to run a Win Crash program, based on the information that was being put into it.
>
> *Q:* What can you elaborate on the error that the machine punched up?
>
> *A:* The error I was getting was what they call a "spin calc." And as I read the manual, the error equates to because from impact to the final rest, the Baretta [sic], when it went airborne over that ditch, didn't go sliding down the ditch, it went over. So in the—the—one of the check boxes that you have is, I believe I mentioned before, is you have the skid end trajectory and you have the—a roll out.
>
> Well, we don't have a roll out. We have a skidding up to that point and then the vehicle went airborne. But there's no area in the program to say the vehicle went airborne and have the program figure out that speed, based on the distance and that type of travel, and tell it to determine the speed and such.
>
> So what I needed to do is I calculated the speed necessary to get across the ditch. And they have a check box for a path-end velocity. So I basically had to input into the program the skid distance from impact to where it went airborne, and then have to give it a path-end velocity, and it just gave me this error.
>
> So I—again, I can't get into the specific algorithms of the program itself, but the program basically didn't like what I had in there and said there was an error and these results are no good.

Following defendants' convictions, the trial court took additional testimony from Sgt. Brandt in conjunction with the defense motions for a new trial. In his posttrial testimony, Sgt. Brandt said that he ran his own Win Crash analysis after receiving a copy of

defense expert Bereza's Win Crash analysis to determine whether he would receive the same results for the impact velocity. Sgt. Brandt stated that the impact velocity his Win Crash analysis calculated for the Lumina was 58.7 miles an hour, plus or minus 15.3 miles an hour, and 40.6 miles an hour, plus or minus 10.5 miles an hour, for the Beretta. In other words, on the basis of the data he provided the Win Crash program, Sgt. Brandt concluded the car Kris Aldrich was driving was traveling somewhere between 30.1 and 51.1 miles an hour at the time it struck the Lumina. This range encompassed Bereza's estimate that Kris Aldrich was driving at 35 miles an hour or less at the time of impact. Although he had the printout of his Win Crash analysis with him when he testified at trial, Sgt. Brandt conceded that he never provided the defense with a copy of it, apparently pinning his failure to turn over the analysis on defense counsel's failure to ask for it during cross-examination.

Sgt. Brandt provided a copy of the Win Crash analysis printout to the trial court. The analysis, entitled "WinCrash Project Report," first lists measurements taken from the scene of the accident. Using those data, the analysis determines and diagrams various angles and trajectories the Lumina and Beretta were following leading up to the crash. Page five lists the "Linear Momentum Results" for the two vehicles, i.e., the speeds at various times leading up to impact. On the sixth page, consistent with Sgt. Brandt's testimony, the analysis indicates, "The results are useless when true. Rerun!" and that there was "Spin Calc Error" that applied to the Beretta.

Each of the three attorneys present at the hearing took a different approach to arguing whether the

analysis should have been given to the defense and
what effect that failure to disclose would have on the
postverdict motion for a new trial. Scorsone empha-
sized that the prosecutor and Sgt. Brandt were on the
same "team" for the purposes of the prosecution,
which meant that the prosecutor had a duty to pro-
duce the analysis. Kyall Aldrich's attorney argued that
the analysis corroborated Bereza's report, indicating
that a race did not precede the crash. Like Scorsone,
he also argued that the prosecutor had an obligation
to turn over the analysis, having already made a
proper demand, and that the failure to disclose the
analysis deprived the jury of an opportunity to con-
sider it. The prosecutor contended that, under *People
v Newhouse*,[1] the defense had to prove that the analy-
sis was newly discovered evidence that would affect
the outcome of the trial. However, according to the
prosecutor, the evidence concerning the analysis
came out at trial and would not have any possibility
of affecting the outcome of the trial because, as Sgt.
Brandt explained, the analysis failed to reach a con-
clusion on the speed at the time of impact and Sgt.
Brandt did not rely on the results to form his opinion
on the circumstances surrounding the crash.

The trial court then ruled from the bench:

> *People v Newhouse*, 104 Michigan Appeals 300, 1981, and
> many other cases, recite the four factors necessary to
> establish a claim of newly discovered evidence which
> would entitle the defendant to a new trial.
>
> First, it must be newly discovered. Second, it may not be
> cumulative. Third, it is such as to render a different result
> probable at retrial. And fourth, the defendant must not have

---

[1] *People v Newhouse*, 104 Mich App 380; 304 NW2d 590 (1981).

been able to, with reasonable diligence, been able to produce this evidence at trial.

During the defendant's discovery demand, the defendants made a request for, inter alia, ["]results of all scientific or other expert tests, including file reports, memorandums, reports made in connection with this case, within the possession, custody or control of the prosecution, the existence of which is known or may become known to the prosecution." End of quote in pertinent part.

In this particular case, the Court determines that the People—that the report, the Win Crash program, was not even in existence until sometime on October 26th, 1998, literally the day before Sergeant Brandt testified.

And when Sergeant Brandt came to court the following day, the prosecutor has said he was not provided a copy of Mr. Brandt's report, and I'll accept that as true. When Sergeant Brandt was on the witness stand, he indicated, among other things, that he did not believe that an expert could come up with any reliable speed, given certain lack of important measurements or adequate measurements which Sergeant Brandt testified to in this case. This all came out on direct examination.

He said that the measurements conducted by the investigators at the crime scene, from the sheriff's department, simply were not adequate, and he detailed in specifics why they weren't.

He also testified that there were three tire marks that could not have been related to this motor vehicle accident, and that any other persons who would indicate that they did, to the extent that those other persons, including another expert, utilized those marks as part of a speed calculation, they would be, "dead wrong," and then emphasized again that he could give a reliable speed demonstration [sic, determination].

Now, it's instructive in this particular case that the expert did specifically state, during his testimony, that he ran a Win Crash program, and that there was an error in the program. And, quite frankly, if defense counsel had asked to examine a Win Crash program at that point, all they had to do was ask.

So this is not a situation where in this Court's opinion, this is newly discovered evidence. It was known at the time of Sergeant Brandt's testimony [that he] had run a Win Crash program, and that the results were erroneous, and, quite frankly, that duplicates exactly what the Court has heard today and what his report indicates; and that is, is that the results were not reliable.

I don't know how producing the Win Crash program in court could have enabled defense counsel to produce evidence which, ". . . would probably have rendered a different result in this case." Even at best, if it were impeachment—and I can't imagine how it could be—it, in this Court's opinion—impeaching evidence cannot, under the law, be the basis for a new trial; it must be substantive evidence, not impeachment evidence. And I just don't see it here.

And so, A, it's not newly discovered. And B, it would not have probably rendered a different result at trial.


II. THE TRIAL COURT'S DECISION


The record makes clear that the prosecutor and the trial court both relied on case law addressing newly discovered evidence because Kris Aldrich's motion for a new trial claimed that the Win Crash analysis was newly discovered evidence. Nevertheless, the transcript of the postverdict motion plainly indicates that, by the time the parties appeared at the hearing, Kris Aldrich had added a new legal ground to his motion for a new trial: a discovery violation. Whether Kris Aldrich, through his attorney, should have filed a new written motion to bring this shift in direction to the trial court's attention is not at issue here. Rather, because Kris Aldrich's attorney made this argument so explicitly at the hearing, the issue that interests me

in writing this concurrence is whether the prosecutor committed a discovery violation.[2]

### III. DISCOVERY VIOLATION

Pursuant to *Brady v Maryland*,[3] prosecutors have a constitutional[4] duty to disclose evidence that is "material either to guilt or to punishment,"[5] including impeachment evidence.[6] This duty to disclose remains[7] regardless of whether the prosecutor has good or bad intentions[8] in withholding evidence and even if the police fail to give evidence to the prosecutor.[9] Thus, in this case, whether the prosecutor actually knew that Sgt. Brandt had generated the Win

---

[2] When a trial court does not make a finding on an alleged discovery violation, this Court's modern approach to determining whether the prosecutor unconstitutionally suppressed evidence has been to remand the case to the trial court. See *People v Lester*, 232 Mich App 262, 282-283; 591 NW2d 267 (1998). However, the trial court judge who presided in this case, Judge METER, is now an esteemed colleague on this Court. Though a new judge assigned to address a remand would likely be able to deal with this issue deftly, the new judge would lack the insight into the case that Judge METER would have. More importantly, this opinion does not represent the majority's view, which allows this analysis to be an academic exercise, making remand unnecessary.

[3] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[4] The prosecutor's ethical duty to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the degree of the offense" under MRPC 3.8(d) adds more support to the notion that disclosure is critical.

[5] *Brady, supra* at 87.

[6] *United States v Bagley*, 473 US 667, 676-677; 105 S Ct 3375; 87 L Ed 2d 481 (1985); see also *Lester, supra* at 281.

[7] Prosecutors have a "continuing" duty to disclose this sort of material evidence. See MCR 6.201(H); *People v Taylor*, 159 Mich App 468, 475-476; 406 NW2d 859 (1987).

[8] *Brady, supra* at 86.

[9] See *Giglio v United States*, 405 US 150, 153-154; 92 S Ct 763; 31 L Ed 2d 104 (1972); see also *Kyles v Whitley*, 514 US 419, 438-440; 115 S Ct 1555; 131 L Ed 2d 490 (1995).

Crash analysis makes no difference in whether Kris Aldrich would be entitled to a new trial under *Brady*. That case has been interpreted to mean that, to earn a new trial, a defendant must demonstrate

> (1) that the state possessed evidence favorable to the defendant; (2) that he did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.[10]

There is no question that the state possessed the data entered in the Win Crash analysis and that it possessed the disputed result it produced. Sgt. Brandt is an agent of the state and, at trial, he conceded that he had produced the analysis. However, from my perspective, one of the more difficult aspects of this case is determining whether the Win Crash analysis generated was favorable evidence within the meaning of *Brady's* first element. In *Kyles v Whitley*,[11] the United States Supreme Court interpreted the commentary on "favorable evidence" contained in *United States v Bagley*,[12] to mean that "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' "[13] The *Kyles* Court went on to explain:

---

[10] *Lester, supra* at 281-282.

[11] *Kyles, supra* at 433.

[12] *Bagley, supra.*

[13] *Kyles, supra* at 433, quoting *Bagley, supra* at 682.

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."[14]

This reasoning is somewhat circular in that it relies on the fourth element of the *Brady* test to define what constitutes favorable evidence, a threshold question in the first element. This explanation in *Kyles* helps to narrow the class of evidence subject to the discovery rule to those pieces of evidence that are likely to make a trial fair. Evidence immaterial to the fair conduct or result of a trial are not subject to the *Brady* rule. Thus, I interpret the approach required under *Kyles* to mean that the evidence allegedly suppressed must be viewed in the context of the trial, with materiality determined from the role the evidence would have played at trial had the defense known of its existence and had access to it.

The parties hotly contest whether the Win Crash analysis would have made Kris Aldrich's trial fair. They do not, however, distinguish between the logical components of the Win Crash analysis. On one hand there is the *data* that went into the Win Crash analysis. For the most part, no one disagrees that the defense was entitled to this evidence and that it had adequate access to and notice of the pertinent ground measurements that Sgt. Brandt used when he ran the

---

[14] *Kyles, supra* at 434.

Win Crash software.[15] In any event, Kris Aldrich does not claim that the prosecutor improperly withheld these measurements and, in fact, defense expert Bereza evidently had sufficient evidence of this sort to run the Win Crash analysis himself.

On the other hand is the *result* Sgt. Brandt's Win Crash analysis allegedly produced, arguably the most valuable part of an expert's report.[16] The prosecutor did not reveal this result to the defense at any time before or during trial and, despite what seemed to be fairly rigorous cross-examination, Sgt. Brandt did not reveal those results during his trial testimony. Thus, the discovery violation question in this case becomes a narrow one: Did the prosecutor have an obligation under *Brady* to reveal the disputed *result* of the Win Crash analysis to the defense because it was favorable evidence and, without such a disclosure, is the verdict to be trusted?

This focus on the Win Crash result is somewhat at odds with the focus in the typical discovery violation case. The Win Crash result is not evidence of the crime in the sense that a bloody knife would be evidence of a murder or a videotape might record a

---

[15] Kris Aldrich did not argue in the trial court and has not argued on appeal that the prosecutor should have revealed the calculations Sgt. Brandt made to fill in the data missing because the Beretta left the ground.

[16] See *Williams v Taylor*, 529 US 420, 438-439; 120 S Ct 1479; 146 L Ed 2d 435 (2000) (allegedly undisclosed psychiatrist's report of accomplice "concluded" that the accomplice had little memory of the rape and double murder, despite trial testimony recalling the crime); *Pitchess v Davis*, 421 US 482, 483; 95 S Ct 1748; 44 L Ed 2d 317 (1975) (suppressed laboratory report revealed that police testing failed to find sperm on samples taken from victim after rape); *United States v Beaver*, 524 F2d 963, 965-966 (CA 5, 1975) (prosecution turned over fingerprint expert's entire report, which did not include the number of points used to identify fingerprints as part of conclusion).

bank robbery, both of which are clearly material evidence.[17] Rather, the Win Crash analysis attempts, not always successfully, to piece together disparate pieces of evidence gathered from the scene of a crash in order to give a meaningful description of the largely invisible physical forces that contributed to that crash. When Win Crash provides a description of those physical forces—the result—trained experts like Bereza and Sgt. Brandt are supposed to be able to "reconstruct" events leading up to a crash, providing insight into the accident that, perhaps, even an eyewitness would not be able to give when testifying. In other words, even though they did not observe the crash, these experts are remarkably valuable to the truthfinding function that a trial serves because they know how to analyze the data and interpret the result.

Given the critical role this sort of data analysis plays in forming expert opinion, I agree that the prosecutor ordinarily has an obligation to reveal Win Crash analysis results to the defense. Typically, these results will be relevant to impeaching the expert witness who gives an opinion on what contributed to an accident, such as impact speed.[18] Or, as Kris Aldrich contends in this case, these results may corroborate an exculpatory defense theory, such as his explicit claim that the evidence did not prove that he was speeding at the time of the crash. This could contradict the prosecutor's theory that Kris Aldrich was guilty of involuntary manslaughter because he was

---

[17] See MCR 6.201(A)(6).

[18] See *People v Brownridge (On Remand)*, 237 Mich App 210, 214; 602 NW2d 584 (1999) ("Impeachment evidence . . . falls within the *Brady* rule.").

committing an unlawful act, drag racing, at the time of the accident.[19] Even the court rules recognize the critical value of a report prepared by an expert in requiring that the defense and the prosecution disclose "any report of any kind produced by or for an expert witness whom the party intends to call at trial[.]"[20]

This, however, is not an ordinary case, because the Win Crash analysis never actually produced a result. Evidently, the Win Crash software relies on measurements taken from the ground and, because the Beretta left the ground when it flew over the ditch, Sgt. Brandt had to estimate other numbers to enter in the Win Crash program to replace missing ground measurements. The Win Crash software was able to determine that the numbers he entered did not, or perhaps could not, accurately describe the physical forces at work, because the "spin calc" was erroneous. Although, taken at face value, the printout of the Win Crash analysis "reported" results on page five, the Win Crash software noted that Sgt. Brandt had not provided the data necessary to *complete* the analysis even though the software indicated what it would conclude had those numbers been true. Consequently, the Win Crash report stated that the analysis had to be performed again, indicating to any reader that the report should be read as if page five were blank because the erroneous calculations were of no consequence. With these facts, it would be logically inconsistent to conclude that the Win Crash analysis pro-

---

[19] See *People v Holtzman*, 234 Mich App 166, 188; 593 NW2d 617 (1999) ("Prosecutors must provide each defendant with any exculpatory information or evidence known to them.").

[20] MCR 6.201(A)(3).

duced a result that the prosecutor should have shared with the defense, regardless of whether it was "favorable" to the defense, when the software itself acknowledged that the data could not support a final finding.[21]

The uniqueness in this case comes from *the lack of* a result. I see the possibility that, in another case, an expert witness might choose to *disregard* a result produced by a Win Crash analysis on the basis of statistical improbability when forming an opinion on what caused an accident. In that case, despite the questionable validity of the result, I would conclude that the prosecutor must turn that information over to the defense, which can then determine whether to present the evidence to the jury.[22] Juries, not prosecutors, are entrusted with the obligation of determining the ultimate value of evidence, which is why courts encourage placing all relevant and admissible evidence in front of the jury.[23] Thus, the prosecutor and defense would offer differing arguments concerning why the jury should or should not rely on the Win Crash result to render a verdict. However, in this

---

[21] Note that *Random House Webster's College Dictionary* (2d ed) defines a result as an "outcome."

[22] I have not attempted to analyze whether the Win Crash analysis is a report within the meaning of MCR 6.201(A)(3). However, I think it possible that a "report" under MCR 6.201(A)(3) requires some of the same indicia of finality or conclusion that the Win Crash analysis in this case lacks. To paraphrase Justice Souter, writing for the majority in *Kyles, supra* at 439-440, prosecutors cannot avoid making fine line determinations concerning what evidence to disclose and, if there is any error to be made, it should be made in favor of disclosure. Thus, even when of questionable value, the prosecutor should turn over analysis results.

[23] See, generally, *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992), quoting *People v Palmer*, 392 Mich 370, 375-376; 220 NW2d 393 (1974) (" 'It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact . . . .' ").

case, the prosecutor neither deprived the defense of an opportunity to present Sgt. Brandt's Win Crash result to the jury nor usurped the jury's authority to weigh the evidence because Sgt. Brandt's analysis *did not produce a result.*

Even assuming that the Win Crash analysis constituted real evidence that the prosecutor suppressed—which the defense had taken every reasonable effort to secure by making a comprehensive discovery request—it was nevertheless immaterial to the fairness of the trial. Had Sgt. Brandt attempted to draw any conclusions from the Win Crash analysis, the defense would have been well-advised to object to related testimony, or an offer to admit the Win Crash analysis printout into evidence, as irrelevant.[24] The Win Crash analysis itself warned that the speeds it had calculated "are useless when true," indicating that they were false calculations. Having virtually ordered the individual inputting the data to "Rerun!" the program, no one can doubt that the Win Crash analysis had failed to reach a result, regardless of the statistical measures of validity that could shake or shore up confidence in any particular result. Fair trials simply are not made with evidence that proclaims itself, independent of external judgments, untrustworthy and patently worthless. Had the defense been able to introduce the miscalculations in the Win Crash analysis at trial, I would be no more certain that Kris Aldrich, or his brother for that matter, received justice through the process a fair trial affords.

---

[24] MRE 401.

IV. FINAL NOTES

Though I conclude that there was no discovery violation in this case, one more point bears mentioning. At the hearing on the motion for a new trial, the prosecutor argued, in part, that a new trial was not necessary because Sgt. Brandt had not relied on the Win Crash analysis in forming his opinion concerning the crash. That is not relevant to determining whether, assuming that the prosecutor did suppress favorable evidence, Kris Aldrich is entitled to a new trial. For strategic reasons, prosecution experts will likely choose *not* to rely on the most material *exculpatory* evidence, just the sort of evidence the prosecutor must provide to the defense. Moreover, the argument that Sgt. Brandt, whose testimony was critical to the prosecution, did not rely on the Win Crash analysis is akin to arguing that even without submitting the Win Crash analysis to the jury, the evidence adduced at trial was still sufficient to sustain a conviction. The United States Supreme Court has made it clear that sufficiency of the evidence is *not* the standard courts apply when determining whether the prosecutor acted unconstitutionally in suppressing evidence.[25]

---

[25] See *Kyles, supra* at 434-435.