# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY SEAN DUKE,

        Defendant-Appellant.

UNPUBLISHED
February 14, 2017

No. 330074
Livingston Circuit Court
LC No. 14-022352-FH

Before: RONAYNE KRAUSE, P.J., and O'CONNELL and METER, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of first-degree felony-murder, MCL 750.316(1)(b) (merged with second-degree murder, MCL 750.317); first-degree home invasion, MCL 750.110a; larceny in a building, MCL 750.360; felon in possession of a firearm, MCL 750.224f; and four counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b (count related to second-degree murder merged with count for felony-murder). The trial court sentenced defendant as an habitual offender, fourth offense, MCL 769.12, to concurrent prison terms of life without parole for felony-murder, 15 to 25 years for home invasion, and 10 to 15 years each for larceny and felon-in-possession; it also imposed two-year sentences for each of the felony-firearm convictions. Defendant appeals as of right and we affirm.

Defendant's convictions resulted from the shooting death of Ron Hauser while Hauser was alone in his home. The body was discovered on December 31, 2011, after Hauser did not respond to attempts to contact him throughout the day. Hauser was known to carry a large amount of money on his person but it was not found after his home was searched. Defendant became a suspect after he posted on social media that he had $30,000 to spend, which was uncharacteristic of defendant.

Defendant first argues that the evidence was insufficient to support his convictions beyond a reasonable doubt. We disagree. This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010).

-1-

Due process[1] requires that every element of a crime be proven beyond a reasonable doubt in order to sustain a criminal conviction. *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979). To determine if the prosecutor produced evidence sufficient to support a conviction, this Court considers "the evidence in the light most favorable to the prosecutor" to ascertain " 'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010), quoting *People v Hardiman*, 466 Mich 417, 429; 646 NW2d 158 (2002). Direct and circumstantial evidence, as well as all reasonable inferences that may be drawn from it, are considered to determine whether the evidence was sufficient to sustain the defendant's conviction. *Hardiman*, 466 Mich at 429.

Defendant argues that he should not have been convicted of the crimes for which he was sentenced because the evidence did not demonstrate that he was at or in Hauser's home on the date of the murder. "[I]dentity is an element of every" crime. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Defendant argues that the evidence only produced a reasonable suspicion that defendant shot Hauser and took cash from his home because there was no evidence that cash was taken from the home and no direct evidence that defendant was present at the home. However, the circumstantial and firearm evidence, and the reasonable inferences from this evidence, when viewed in a way that favors the prosecution, constituted sufficient evidence to convict defendant beyond a reasonable doubt.

Numerous witnesses testified about defendant having a shortage of money shortly before the December 30, 2011, murder. Testimony from several people demonstrated that defendant had knowledge of Hauser and his habit of carrying a large amount of cash with him, and there was also testimony that Hauser hid more money on his property. According to Hauser's girlfriend, defendant had worked on Hauser's property as late as December 19, 2011, and she saw Hauser getting ready to pay defendant by pulling out his bag of cash. Defendant told the police that he had been to Hauser's home and knew he carried cash. Moreover, according to defendant's father, defendant had told him that he had knowledge of where Hauser kept his money and had stolen from him, without Hauser's knowledge, in the past. Moreover, Christopher Chambers recalled a 2006 conversation during which defendant, who was in need of money at the time, said that he wanted to rob Hauser and would kill him if necessary.

Hauser was apparently shot around 9:30 p.m. on December 30, 2011; that is the time when his watch stopped. Hauser's brother testified that he had been speaking on the telephone with Hauser shortly before this time as they simultaneously watched the same television channel. When Hauser's body was discovered the next day, the television remained tuned to this channel. Hauser's pattern was to watch the news on a different station after watching the show he had been watching while speaking with his brother.

Defendant initially told police that he was home at the time of the killing, which was contradicted by his girlfriend, and later defendant, who stated that he left home for around an hour to refill his truck with gasoline. Detective Mark Klein was unable to confirm a fuel

---

[1] US Const, Am XIV.

purchase with any of the 680 receipts that defendant had provided or by receipts at the identified gas station. Moreover, Klein reported that defendant made a call from jail telling his girlfriend that he hoped that she knew that he was home on December 30, 2011.

It was determined that a gun was fired from outside of Hauser's home on a trajectory that travelled through a broken window, through the area where Ron's body was found, and to a bullet strike on the wall. Defendant was known to be an accurate shot. Moreover, the police found two sabot pieces in an area outside Hauser's patio door. Defendant was known to use saboted rounds. Klein found a receipt showing that defendant had purchased three boxes of Winchester 2.75 saboted one-ounce 12-gauge ammunition on November 14, 2011. The police recovered four sabot halves in defendant's yard, and recovered fired sabots at his father's residence.

Michigan State Police Firearms Examiner Jeffrey Amley concluded that the rifling characteristics on the sabots recovered from Hauser's home were fired from a Mossberg 12-gauge, rifled-barrel shotgun. Amley found that sabots recovered at defendant's home and his father's home were fired from the same rifle as the one that had fired the sabots at the crime scene. Defendant was known to have possessed a Mossberg 12-gauge shotgun with a rifled barrel and Bushnell scope. Michelle Brandenburg said defendant had borrowed her Mossberg 12-gauge, rifled-barrel, sighted shotgun during several hunting seasons, including in November 2011, and that although he returned it before Christmas 2011, she could not locate it when the police contacted her in March 2012. Moreover, defendant's stepbrother recalled that in early November 2011 defendant was shooting his 12-gauge Mossberg with a scope at their father's home and used Winchester 12-gauge rounds with a sabot. Defendant's father also recalled seeing defendant shooting with a 12-gauge Mossberg with a scope in November 2011 in his backyard. In addition, defendant's girlfriend testified that defendant had hunted on their property with the Mossberg 12-gauge, and recalled that defendant had the Mossberg 12-gauge because he asked her to go hunting on December 16 and 29, 2011. She knew that defendant kept the gun in his truck, and said that she helped him return the gun to Brandenburg's kennel in January 2012. She also indicated that defendant had contacted her from jail to ask her to do something they had talked about previously—purchase a Mossberg 12-gauge to give to the police department. Finally, after his investigation, Klein concluded that defendant was the only individual who knew Hauser and his habits who had access to shoot at his own residence, Hauser's residence, and defendant's father's residence.

Defendant argues that there was no evidence that he entered Hauser's home and took money. However, there was testimony that Hauser had a pattern of carrying cash and also of placing the items from his pocket on his dryer before going to his basement for the remainder of the evening. The police observed items on the dryer but there was no cash on Hauser's body and no cash in the bag on the dryer. Additionally, a safe containing only an empty plastic bag was found near an attic access panel in the ceiling of the master bedroom with a stepladder beneath it; there was an impression in the ceiling insulation that was the size of the safe. Further, although money had been tight for defendant and his girlfriend in December 2011, Klein found a receipt indicating that defendant paid $140 for a hotel room on December 31, 2011, and in the early part of 2012, defendant gave $650 to a friend and purchased an expensive commercial lawnmower, a truck, and an air compressor. Moreover, there was testimony that defendant posted on his social

media page that he had $30,000 to spend and that he had sent a friend a picture of several $100 bills fanned out on his bed around March 2012.

Defendant's father became concerned when he noticed that defendant was purchasing items, had no reaction to news of Hauser's death, refused a ride to Hauser's funeral, and confided that he had taken money previously from Hauser. Additionally, defendant's girlfriend found that defendant had searched how to beat a lie detector test on their computer and the police found a printed report about the topic in defendant's truck.

No witness saw defendant at Hauser's residence on December 30, 2011, or viewed him taking money away from the residence. However, the circumstantial evidence and reasonable inferences arising from it, especially the failed alibi, the forensic evidence suggesting that defendant had been at Hauser's home with his gun, defendant's earlier statement indicating that he would kill Hauser to get his money and his admission that he had previously stolen from Hauser, and the fact that defendant was in need of money at the time of the killing and appeared to have excess money afterwards and had made big-ticket purchases, when taken in a light most favorable to the prosecution, was sufficient to demonstrate beyond a reasonable doubt that defendant shot Hauser to death at his home and then took money from the home.

Next, defendant argues that the trial court erred in granting plaintiff's motion to admit evidence of defendant's research regarding polygraph examinations. Specifically, the police recovered a manual about how to successfully take a lie detector test in defendant's truck, defendant's friend said that defendant showed him a copy of the manual in February or March 2012, and defendant's girlfriend said that she observed that defendant had searched about how to defeat a lie detector test on their computer and had printed out a document on the topic.

"[T]he results of a polygraph examination are not admissible at trial." *People v Ray*, 431 Mich 260, 265; 430 NW2d 626 (1988). "Testimony concerning a defendant's polygraph examination is not admissible in a criminal prosecution" and it is plain error for the jury to be presented with the results of a polygraph examination. *People v Kahley*, 277 Mich App 182, 183; 744 NW2d 194 (2007). Polygraph evidence is excluded because the scientific reliability of the test has not been adequately demonstrated, and there is a danger that jurors will abdicate their role by relying on the results of the test as conclusive proof of a defendant's culpability. *Ray*, 431 Mich at 265; *People v Yatooma*, 85 Mich App 236, 241; 271 NW2d 184 (1978).

The trial court made a distinction between the results of a polygraph examination and evidence that someone had inquired about beating a polygraph. With the latter, there was no danger that the jury would infer the results of a polygraph and it tended to show a consciousness of guilt. The trial court cautioned the prosecutor that any reference to taking a polygraph or the results of a polygraph would be inadmissible error that could require a mistrial. There was no reference to whether defendant was offered a polygraph, to the administration of a polygraph, to the results of a polygraph, or to statements made before, during, or after a polygraph. There was no evidence that a polygraph was involved in the investigation. Thus, there was no danger that the results of a scientifically unproven instrument would affect the jury's deliberations. The jury was not presented with evidence regarding a polygraph from which they could infer the credibility of any witnesses. See, generally, *People v Ortiz-Kehoe*, 237 Mich App 508, 515; 603 NW2d 802 (1999).

-4-

Defendant further argues that the statements about his research were inadmissible because they were irrelevant. "Generally, all relevant evidence is admissible at trial." *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "Under this broad definition," evidence that is useful in shedding light on any material point is admissible. *Aldrich*, 246 Mich App at 114. To be material, evidence does not need to relate to an element of the charged crime or an applicable defense. *People v Brooks*, 453 Mich 511, 518; 557 NW2d 106 (1996). "The relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material." *People v Yost*, 278 Mich App 341, 403; 749 NW2d 753 (2008) (citation and quotation marks omitted).

Here, the evidence was relevant to demonstrate a consciousness of guilt. The evidence demonstrated that defendant was considering whether to attempt to avoid prosecution by successfully completing a polygraph through deceitful means; if he could have passed a lie detector test because he was answering questions truthfully, there would have been no need for him to try to discern how to otherwise successfully take a lie detector. The evidence tended to indicate that defendant was contemplating how he could convince police that he was not involved, similar to instructing his girlfriend regarding the purchase of a Mossberg 12-gauge that he could present to police and claim as his own, and reminding her to inform the police that he was home on the night of the crimes. The evidence was relevant to demonstrate that defendant was using a strategy of deception in reaction to accusations against him.

Defendant argues that the evidence about his research concerning polygraph examinations should have been excluded because it was unfairly prejudicial. Relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice[.]" MRE 403; see also *Aldrich*, 246 Mich App at 114. "All relevant evidence is prejudicial; it is only unfairly prejudicial evidence that should be excluded." *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Gipson*, 287 Mich App 261, 263; 787 NW2d 126 (2010) (citation and quotation marks omitted). Evidence that is unfairly prejudicial goes beyond the merits of the case to inject issues broader than the defendant's guilt or innocence, such as the "jury's bias, sympathy, anger, or shock." *McGhee*, 268 Mich App at 614.

Defendant states that the evidence was unfairly prejudicial because it was part of the circumstantial evidence with which defendant was convicted, with a lack of direct evidence. However, this was one item of evidence among several indicating that defendant acted and considered strategies to possibly conceal his involvement in the crime. The evidence that defendant did research was unlikely to incite the jury to unfairly convict defendant because it did not relate to actually taking a polygraph or the results of a polygraph, and was consistent with several similar accounts of defendant's behavior. The evidence was merely an example of defendant's approach after the police began to investigate his possible involvement.

Next, defendant argues that the trial court erred in overruling defendant's objection to the admission of the statement of intent to kill Hauser that was made five years before the instant

crime. Defendant argues that this statement was irrelevant and unfairly prejudicial. Although the trial court ruled that this was a statement against defendant's interests, we clarify that it was an admission by a party-opponent, admissible under MRE 801(d)(2)(A) as a non-hearsay statement.[2] Defendant argues that the statement was irrelevant because it was made five years before defendant's criminal actions and was, therefore, unrelated to the issues at trial. However, it is possible that a plan was in place for five years until the right circumstances were presented. The statement was relevant because it demonstrated defendant's motive to kill Hauser for money, regardless of the timing. It also demonstrated defendant's knowledge of Hauser's habit of having money in his home.

Defendant argues that the evidence was unfairly prejudicial because the jury could have mistaken defendant's flippant comment to his friend five years before the crime for a five-year plan. The evidence was prejudicial due to its highly probative value, but it did not introduce any issues to the jury beyond defendant's culpability for the crimes. The evidence plainly and squarely addressed defendant's motive and plan, which was enacted much later, to commit the crimes, and did not unfairly present these issues.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Peter D. O'Connell
/s/ Patrick M. Meter

---

[2] A statement is not hearsay if "[t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity . . . . MRE 801(d)(2)(A).