*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

FREDIE PHILLIP KORYAL,

        Defendant-Appellant.

UNPUBLISHED
August 29, 2019

No. 343794
Oakland Circuit Court
LC No. 2017-264035-FC

Before: SHAPIRO, P.J., and GLEICHER and SWARTZLE, JJ.

PER CURIAM.

A jury convicted defendant of criminal sexual conduct, assault, and domestic violence offenses. Both defendant and the victim testified at trial, offering conflicting versions of the events that took place on the night in question. In addition, an emergency-room physician and a nurse-sexual-assault examiner testified regarding what the victim told them about the incident, and the trial court admitted their medical reports into evidence. Defendant appeals as of right from his jury convictions, arguing that the trial court erroneously allowed the medical witnesses to offer evidence regarding the victim's statements describing the assault. Defendant argues that the victim's statements to the two medical witnesses were not reasonably related to medical diagnosis and treatment, and thus, should not have been admitted into evidence under MRE 803(4). We affirm.

## I. BACKGROUND

### A. THE VICTIM'S TESTIMONY

Defendant and the victim lived together at a residence in Rochester Hills, Michigan. On June 12, 2017, sometime after 9:00 p.m., defendant and the victim returned home. The victim gave the following account of the events that occurred that evening. Around 10:00 p.m. or 10:30 p.m., the victim attempted to fall sleep, but defendant was talking loudly on the phone. Defendant told the person on the phone that he was going to kick the victim's ass because "she's a bitch, she's a whore, and she's embarrassed me." After defendant concluded the phone call, he entered the bedroom, put his foot on the edge of the bed, and asked the victim if she heard his

-1-

telephone conversation. The victim lied and said "no" because she was afraid and did not want to argue with or aggravate defendant.

Defendant then slapped the victim's face and punched her in the head. Defendant told her to undress because he wanted to have sex; defendant made the victim perform oral sex on him, and defendant also performed oral sex on the victim. The victim did not want to have sex but complied with defendant's demands because she was afraid defendant was going to kill her. During sex, defendant told the victim that she was a "bitch," "whore," and "slave," and that he was going to kill her and bury her body in the backyard. Defendant pulled and tore the victim's hair out of her head and continually struck her. Defendant pressed his fingers onto the victim's windpipe and squeezed her neck to prevent her from breathing. Defendant put his hand on the victim's nose and mouth, and he put two or three fingers down the victim's throat. The victim could not breathe; she thought she was going to die. Defendant put a pillow on the victim's face and squeezed; she kept asking him to stop and tried to push him away from her but was not strong enough to do so.

Defendant wanted the victim to look for a piece of lingerie he had bought her. The victim found the top part of the lingerie, and defendant hit her because she was unable to find the bottom. The victim put on the top part of the lingerie, but defendant nonetheless continued to hit her. Defendant put the victim in a headlock; she then bit his finger to try to get away from him. Defendant's finger started to bleed, and he had to look for a towel. When defendant went to the bathroom, the victim ran out of the side door of the house and across the street to a neighbor's house. The victim knocked on the neighbor's front door and yelled for help. Because no one answered the door, the victim ran toward the backyard. While the victim was at the side of the neighbor's house, she saw defendant come outside; defendant told someone over the phone that his finger was bleeding, a "crazy girl" attacked him, he needed help, and he was dying. The neighbor testified that he went to the front door and no one was there, but he found the victim, who was "nude from about the middle of her back down," inside his enclosed back porch. The neighbor called 911.

## B. DEFENDANT'S TESTIMONY

Defendant's version of events differed from the victim's version of events, as they disagreed about whether the sexual relations that they had on the night in question were consensual and whether defendant caused the victim's numerous physical injuries. Defendant testified that the victim called him a "bitch" and that this upset him. Defendant testified that, after the victim called him this, he asked the victim whether she wanted to have sexual relations and she agreed. Defendant admitted that he asked the victim to dress in lingerie and that she did so. Defendant testified that they had consensual sex and that he did not assault the victim. Defendant testified that, after they had sexual relations, he was still bothered that the victim called him a "bitch" and he decided to leave her, so he began to pack his belongings. Defendant claimed that the victim was upset that he was leaving her, and she began slapping and choking herself while yelling, screaming, and pushing defendant. He further claimed that he went out the front door of the residence because he thought the victim was going to retrieve a gun to kill him or herself.

## C. FIRST-RESPONDER TESTIMONY

Deputy Che McNeary of the Oakland County Sheriff's Office testified that when he arrived on scene at about 2:30 a.m., he saw defendant lying face-down on the driveway, wearing only his underwear. Defendant was talking to the emergency-dispatch operator on a cell phone that was lying on the ground next to him. Deputy McNeary testified that defendant was screaming and yelling that his girlfriend had bitten his finger. Deputy McNeary asked defendant why he was lying face-down on the ground, to which defendant replied that he wanted the deputy to handcuff him. Although Deputy McNeary told defendant that he was unaware that defendant had done anything wrong, defendant insisted that he was giving himself up to police. Deputy McNeary therefore placed defendant in the back of his patrol car.

The victim then emerged from the neighbor's porch, yelling that defendant had assaulted her. Police witnesses testified that the victim appeared to be crying, shaking, scared, and embarrassed by her state of undress. Deputy Donald Greenwald testified that the victim was "extremely distraught" and "crying hysterically." He testified that the victim claimed to have been punched in the head several times, and complained that her head was hurting. A deputy took the victim inside the house and she put on some clothes.

One of the responding paramedics testified that he examined the victim on scene and that she appeared "very upset," "scared," and "kind of frantic." The victim told the paramedic that she had been punched in the head and that she had been sexually assaulted. Without objection by defense counsel, the trial court admitted into evidence the fire-department report which stated:

> PT [patient] stated that she was assaulted by her significant other and claimed that he punched her in the back and the head. PT further stated that she was forced to have sexual intercourse with significant other as well. Physical assessment found no obvious signs of injury, however, PT was visibly scared and upset.

The victim asked to go to the hospital for further treatment, and the paramedics transported her to the emergency room.

## D. DR. NAKAHODL'S TESTIMONY

The victim arrived at Crittenton Hospital at 3:30 a.m. Dr. Katia Nakahodl, an emergency-room physician, testified at trial as an expert witness in the field of emergency medicine. Dr. Nakahodl treated the victim in the emergency room. Consistent with her standard practice when treating patients, Dr. Nakahodl asked the victim what occurred to determine the appropriate medical treatment. In this case, the victim was "crying" and "hysterical," with an elevated heart rate, and it took Dr. Nakahodl 20 to 30 minutes to calm her down enough to be able to ask the victim what had happened.

Dr. Nakahodl explained that, once she calmed down, the victim conveyed to her what happened that night, so she could "get an idea of what we would need to focus on in terms of assessing her, you know, with x-rays or imaging and things like that, and what we needed to examine physically." Without objection by defense counsel, Dr. Nakahodl testified that the victim told her the following:

[S]he basically said that she was assaulted by her fiancé; that he had come into her room and woke her up. I think—I think he woke her up by—by punching her, punched her multiple times, and then forced her to have vaginal intercourse. I mean, yeah, and then he punched her in the face, punched her in the mouth. This kind of went on and on. He then made her stand in the kitchen. I remember this clearly. He had gotten her some lingerie from three years ago, and he forced her to put it on, and stand under the kitchen light just, like, with the lingerie on, and apparently he thought that the strings were placed incorrectly, so then he flew into another rage. I think he pushed her down. With her hands behind her back, I think he started punching her in the back at that point. He then was dragging her around the house, kind of berating her, punching or kicking her. I know that this went on—it sounds like it went on for a couple of hours. And then, finally, she was able to—I think [sic] her in a headlock, she bit his finger, and then it startled him, and that she was able to finally get away.

Dr. Nakahodl also testified that the victim appeared to feel "devastated" and "ashamed" by what happened, and that the victim was "blaming herself" because she had not told anyone that defendant had been abusing her for several months.

After hearing the victim's account of how she incurred her injuries, Dr. Nakahodl then performed a physical examination of the victim. She discovered that the victim had bruising on the left side of her face and jaw; there was a linear, superficial abrasion on her neck; there were red marks that looked like finger marks on the front part of her neck and right upper arm; there were bruises over her knees, lower legs, left elbow, left side of her neck, and upper back. In summary, Dr. Nakahodl testified that there were multiple contusions and abrasions all over the victim's body. In addition, Dr. Nakahodl observed that the victim had spasms in her upper back, and she testified that such spasms can occur when a patient has been punched. Dr. Nakahodl performed imaging of the victim's head, facial bones, neck, and spine. A CAT scan showed soft-tissue swelling on the left frontal scalp, and Dr. Nakahodl testified that such swelling can occur when a patient has been punched.

### E. DR. NAKAHODL'S WRITTEN REPORT

At the end of Dr. Nakahodl's testimony, the prosecutor sought to admit the doctor's written medical report into evidence. Defense counsel objected to the admission of the report, arguing that no foundation had been laid to indicate that the victim's statements in the doctor's report were made during the course of medical treatment or were necessary for such treatment. The trial court overruled defendant's objection, ruling that the prosecutor had laid the proper foundation for the admission of the report because she established that the victim's statements to the doctor were made for the purpose of obtaining medical treatment.

### F. NURSE ZALECKI-BERTALAN'S TESTIMONY AND WRITTEN REPORT

Once the victim was released from the emergency room, the police transported the victim to see Diane Zalecki-Bertalan, a sexual-assault-nurse examiner. Zalecki-Bertalan testified at trial as an expert witness in the fields of forensic nursing and strangulation. Consistent with her standard practice when performing sexual-assault examinations, Zalecki-Bertalan asked the

victim demographic information, contact information, and obtained a medical history before asking her what occurred during the assault. Zalecki-Bertalan testified that the purpose of obtaining a patient's narrative is to determine how to conduct the physical examination, such as knowing where to look for signs of injury and collecting evidence. Zalecki-Bertalan testified that she uses a patient's narrative to understand the patient's injuries, treat those injuries, create a future treatment plan, and implement safety planning.

In addition to testifying regarding her recollection of the victim's treatment, Zalecki-Bertalan read the following from her medical report:

> [The victim] indicated that she had been sleeping, and she said that the assailant had been drinking. She said she was aware of things in and out. And she remembered him being on the phone and talking to himself. He opened the door. "He made me take off my clothes. He pulled my hair, slapping me. Kept pulling my hair. He put his hand over my mouth. I couldn't breathe or talk." And that's —"And then he put his fingers down throat. He kept saying, 'I love you,' and then he would hit me. He started having sex," and I would have said tell me more about that, "and penis in vagina on top of me. I went along because I was afraid. He made me do oral sex, his penis in my mouth. He then made me go in the corner with my hands behind my back on my knees, and he said, 'If you move, I'll hurt—hit you.' Then, he made me leave the room. He made me put on lingerie. I was in the kitchen. The hits got harder in my head. We got in the living room, and he dragged me by the hair, punched me in the face. It got worse, the hitting. He dragged me to the kitchen. I bit his finger. There was blood. He called 9-1-1. I went into the shed. The police came."

After obtaining that general narrative, Zalecki-Bertalan asked the victim whether she had been strangled. The victim told her that defendant kept putting his hands around her neck and exerting pressure so that she could neither speak nor breathe. The victim said that defendant put a pillow over her mouth and nose, and she thought she was going to die. Zalecki-Bertalan examined the victim's head to investigate the claims of strangulation, and observed bruises and abrasions on the victim's face, neck, jaw, and scalp. In addition, she observed that the victim's eyes were swollen. The victim reported dizziness with headache and throat pain, and Zalecki-Bertalan noted that the victim's voice was raspy. As a result of the victim's disclosures, Zalecki-Bertalan conducted a pregnancy test, which was negative. Zalecki-Bertalan also obtained a urine specimen, which was bloody. Zalecki-Bertalan provided the victim with information regarding treatment for sexually transmitted infection, as well as advice regarding her strangulation injuries.

## G. CONVICTION AND SENTENCE

After the parties closed, the jury convicted defendant of three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(f) (personal injury), assault with intent to do great bodily harm (AWIGBH), MCL 750.84, and domestic violence, MCL 750.812. The trial court sentenced defendant to 15 to 50 years in prison for each of his CSC-I convictions, 3 to 10 years in prison for his AWIGBH conviction, and 93 days in jail for his domestic-violence conviction.

This appeal followed.

## II. ANALYSIS

On appeal, defendant argues that the trial court abused its discretion by allowing Dr. Nakahodl and Zalecki-Bertalan to offer evidence that was not reasonably related to medical diagnosis and treatment, thereby denying defendant his due-process right to a fair trial.

## A. PRESERVATION OF ERROR AND STANDARD OF REVIEW

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). This Court reviews unpreserved claims of evidentiary error for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). "To avoid forfeiture under the plain-error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. at 763. Even when a defendant satisfies these three requirements, this Court will exercise its discretion in deciding whether to reverse a conviction, and will only do so "when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of defendant's innocence." *Id*. (cleaned up).

When an evidentiary issue is properly preserved for appellate review, the "decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion." *Aldrich*, 246 Mich App at 113. "[A]n abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). An abuse of discretion occurs when a trial court's decision is outside this range of principled outcomes. *Id*.

Dr. Nakahodl testified in detail regarding her examination of the victim, including the statements made by the victim during that examination. Defendant did not object to that testimony as hearsay offered in violation of MRE 803(4). Therefore, defendant's claim is unpreserved and we review the admission of that testimony for plain error affecting defendant's substantial rights.

At the end of Dr. Nakahodl's testimony, the prosecutor sought to admit the doctor's written medical report into evidence. Defense counsel objected to the admission of the report, arguing that no foundation had been laid to indicate that the victim's statements contained within the doctor's report were made during the course of medical treatment or were necessary for medical treatment. Although the trial court overruled defendant's objection, the matter is preserved for appellate review.

Zalecki-Bertalan also testified in detail regarding the examination of the victim, including statements made by the victim during that examination. Defense counsel objected to both Zalecki-Bertalan's testimony and the admission of her written medical report. Therefore,

defendant's current objections to the admission of Zalecki-Bertalan's testimony and medical report are preserved for appellate review.

## B. ADMISSIBILITY OF STATEMENTS UNDER MRE 803(4)

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c); *People v Stamper*, 480 Mich 1, 3; 742 NW2d 607 (2007). Hearsay is inadmissible unless it falls under one of the recognized exceptions. *Id*.; MRE 802. Pertinent to this case, MRE 803(4) creates an exception for "Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment."

In *People v Meeboer (After Remand)*, 439 Mich 310, 322; 484 NW2d 621 (1992), the Michigan Supreme Court explained when a statement is admissible under MRE 803(4):

> In order to be admitted under MRE 803(4), a statement must be made for purposes of medical treatment or diagnosis in connection with treatment, and must describe medical history, past or present symptoms, pain or sensations, or the inception or general character of the cause or external source of the injury. Traditionally, further supporting rationale for MRE 803(4) are the existence of (1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient. [*Id.* at 322 (citations omitted).]

In *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011), this Court considered the applicability of MRE 803(4) in the context of sexual-assault examinations and held that statements made to a nurse performing such an examination were admissible under MRE 803(4). This Court stated:

> Statements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care. This is true irrespective of whether the declarant sustained any immediately apparent physical injury. Particularly in cases of sexual assault, in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment. [*Mahone*, 294 Mich App at 214-215 (citations omitted).]

### 1. DR. NAKAHODL'S TESTIMONY

Defendant first argues that the trial court abused its discretion when it allowed Dr. Nakahodl to testify regarding statements made by the victim during her medical examination in

the emergency room. As explained earlier, defendant did not object to this testimony at trial, and we therefore review this unpreserved issue for plain error.

Defendant focuses on the following statements related during Dr. Nakahodl's testimony: (1) defendant assaulted the victim; (2) defendant came into her room and woke her up by punching her multiple times; (3) defendant made her stand in the kitchen, put on lingerie, and stand under the kitchen light before he flew into a rage when he thought that the lingerie strings were placed incorrectly; (4) defendant pushed her down with her hands behind her back, punched her in the back, and dragged her around the house as he berated, punched, and kicked her; and (5) defendant put her in a headlock, but she bit his finger and was able to finally get away. Defendant argues that these statements were inadmissible under MRE 803(4) because they did not help Dr. Nakahodl focus on how to treat the victim's injuries.

Defendant argues that being punched while asleep causes no different injuries to a victim than being punched while awake; thus, the victim's statement to the doctor that defendant began punching her while she was sleeping was inadmissible. Defendant also objects to the doctor's ability to testify that the victim recounted defendant punching her in the back and dragging her around the house as he berated, punched, and kicked her. These arguments are without merit. The victim described to the doctor how many times defendant struck or kicked her, in what areas of her body, and with what quantum of force. These statements were reasonably necessary for diagnosis and treatment of the victim's physical injuries, as they assisted the doctor in determining the need to perform imaging of the victim's head, facial bones, neck, and spine. In light of the soft-tissue swelling and the multiple contusions and abrasions that Dr. Nakahodl observed all over the victim's body, the victim's statements that defendant repeatedly punched and kicked her were reasonably necessary for diagnosis and treatment of those injuries. In addition, although defendant argues that the identity of the person who committed an assault is irrelevant to medical treatment, this argument is clearly without merit because the Supreme Court has held that "the identification of the assailant is necessary to adequate medical diagnosis and treatment." *Meeboer*, 439 Mich at 322.

Defendant also argues that the doctor should not have been allowed to relate the victim's statements that she was dressed in lingerie because those statements were irrelevant to medical treatment. It is arguable whether these statements were reasonably necessary for diagnosis and treatment. While there is nothing about these details that appears relevant to physical injuries, such details could be relevant to psychological harm. If defendant had contemporaneously objected to this testimony, the trial court would have had the opportunity to determine whether the statements were inadmissible. Yet, we note that both the victim and defendant testified at trial regarding this portion of the incident and defendant admitted that he asked the victim to dress in lingerie and that she did so. In addition, both the victim's neighbor and the first responders encountered the victim while she was wearing only that lingerie, and the police witnesses testified regarding the victim's emotional state and embarrassment because she was seen by those witnesses in that state of undress. Given the amount of additional testimony presented in this case regarding the lingerie, we fail to see how the admission of the doctor's unobjected-to statement qualifies as plain error that affected defendant's substantial rights.

Defendant next argues that the victim's statement that she bit defendant's finger was only relevant to defendant's need for medical treatment, but not to the victim's need for medical

-8-

treatment. Given that the victim described biting defendant's finger until he bled, and given the medical realities of blood-borne pathogens the victim may have encountered by having defendant's blood in or near her mouth, we conclude that the victim's statements were admissible as reasonably necessary for medical treatment.

Accordingly, we conclude that the majority of the victim's statements made to Dr. Nakahodl were clearly admissible under MRE 803(4) because they were made for the purposes of medical treatment and diagnosis. The victim's statements of defendant's punching, kicking, hair-pulling, forced sexual intercourse, and strangulation were essential to knowing what injuries to treat. Moreover, the admission of the victim's statements to Dr. Nakahodl that were closer to the line did not amount to plain error that affected defendant's substantial rights.

## 2. DR. NAKAHODL'S WRITTEN REPORT

Defendant next argues that the trial court abused its discretion when it admitted Dr. Nakahodl's written report into evidence because that report recounted the victim's statements about defendant's assault. As explained earlier, defense counsel objected to the admission of the written report into evidence and the trial court overruled the objection, ruling that the prosecutor had established the proper foundation to admit the report into evidence. Therefore, defendant has preserved this issue for appellate review. Yet, defendant does not explain how the written report was substantively different than Dr. Nakahodl's oral testimony regarding the victim's statements, to which defendant did not object at trial. For the reasons explained earlier, we conclude that most of the victim's statements contained in the written report were clearly admissible under MRE 803(4) and the portions that were borderline were substantially identical to testimony admitted into evidence through other witnesses. Thus, the trial court did not abuse its discretion when it admitted the report.

## 3. NURSE ZALECKI-BERTALAN'S TESTIMONY AND WRITTEN REPORT

Defendant next argues that the trial court abused its discretion when it allowed Zalecki-Bertalan to testify regarding statements made to her by the victim during the emergency-room examination. Defendant argues that little of Zalecki-Bertalan's testimony "had anything to do with medical treatment." For the same reasons we found no reversible error with respect to the admissibility of Dr. Nakahodl's testimony and report, we find no reversible error with regard to the victim's statements made to Zalecki-Bertalan. See *Mahone*, 294 Mich App at 214-215.

Additionally, defendant argues that this case hinged on the credibility of the testimony of defendant and the victim, and the admission of the medical testimony deprived him a fair trial. Defendant argues that "[t]his was not a case where there was overwhelming evidence. It essentially was a credibility contest." The medical experts, however, provided a description of what the victim claimed about the assault, along with their objective findings regarding her injuries. Given the other evidence presented to the jury, such as the testimony of the neighbor, paramedics, and police regarding the demeanor of the victim and defendant and their respective injuries, defendant has failed to establish that the trial court erred in allowing the experts to recount the victim's statements.

## C. BUSINESS-RECORDS EXCEPTION TO HEARSAY

Finally, defendant argues that the trial court abused its discretion by ruling that the records of the medical witnesses were admissible under the business-record exception to hearsay because the report involved hearsay-within-hearsay. Hearsay-within-hearsay is inadmissible unless each level of hearsay satisfies an exception to the hearsay rule. MRE 805; *People v Hawkins*, 114 Mich App 714, 719; 319 NW2d 644 (1982).

Defendant relies on *Merrow v Bofferding*, 458 Mich 617, 630; 581 NW2d 696 (1998), for the proposition that a statement contained in a medical record that qualifies as hearsay is not properly admissible under MRE 803. In *Merrow*, the Court concluded that "not every statement contained within" a medical record "is admissible merely because the document as a whole is one kept in the regular course of business." *Id*. at 627. Thus, *Merrow* stands for the unremarkable proposition that hearsay-within-hearsay requires the existence of a separate justification for its admission, i.e., "it must qualify under an exception to the hearsay rule or be properly admissible as nonhearsay." *Id*. In this case, it is precisely MRE 803(4) that provides the criteria by which the admissibility of the victim's statements contained in the medical records of the nurse and the doctor must be examined. Dr. Nakahodl's report regarding the victim's examination was admissible under the hearsay exception for records of regularly conducted activities, MRE 803(6), and—as explained earlier—the victim's statements in the report fall within the exception for statements made for purposes of medical diagnosis and treatment, MRE 803(4). Defendant fails to establish error warranting reversal in the trial court's admission of the report because the statements were reasonably necessary for medical diagnosis and treatment. MRE 803(4).

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Brock A. Swartzle