*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 12, 2021

Plaintiff-Appellee,

v

No. 352578
Monroe Circuit Court
LC No. 19-245175-FC

RAYMOND DONALD BLANCHONG,

Defendant-Appellant.

Before: RIORDAN, P.J., and MARKEY and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions for first-degree felony murder, armed robbery, and unlawful imprisonment. On appeal, defendant argues that he was denied a fair trial because of the admission of identification and narration testimony that invaded the province of the jury. Alternatively, defendant argues that his trial counsel was ineffective for failing to object to the admission of identification and narration testimony that invaded the province of the jury, and that there was insufficient evidence to support defendant's convictions for first-degree felony murder and armed robbery. We affirm.

## I. BACKGROUND

This case arises from the death of James Wappner, whose body was found just north of the Michigan-Ohio border on December 3, 2018. At trial, the prosecutor presented evidence that Wappner was killed on December 2, 2018, while attempting to sell drugs to defendant and his girlfriend, Jessica Lynn Morris,[1] inside a vehicle in the parking lot of the Bedford Inn in Monroe County, Michigan. During trial, witness testimony and physical evidence linked both defendant and Morris to the crime.

---

[1] Morris appealed her conviction and sentence in a separate appeal before this same panel. *People v Morris*, Docket No. 351875.

-1-

At trial, Matthew Richey testified that he discovered a body near a road just north of the Michigan-Ohio border, and he called 911. Paramedic Matthew Dunbar arrived at the scene, and determined that the body had no cardiac activity. Michigan State Police Trooper Eric Pearson arrived at the scene after Dunbar, and he secured the area. Trooper Lance Tedora, who arrived at the scene shortly after Trooper Pearson, noticed that the deceased individual's pant pockets had been pulled inside out. Trooper Jack Taeff brought a police canine to the scene to conduct an article search, but he did not find any narcotics or other evidence related to a potential crime. Trooper Taeff identified the deceased individual as Wappner by using a mobile fingerprint scanner. Detective Sergeant Eric Darling collected the clothing found on Wappner's body and hung the clothing in an "evidence dryer" in order to preserve any trace evidence that may have been on the clothing. Sergeant Darling did not find any drugs or money in Wappner's clothes.

The Lenawee County medical examiner, Dr. Bader Cassin, performed the autopsy on Wappner's body. Dr. Cassin concluded that Wappner had received approximately 20 stab wounds. Dr. Cassin opined that the stab wounds came from multiple angles but he was unable to determine the length of the instrument that caused the wounds or whether more than one instrument was used. Dr. Cassin also opined that Wappner would have been able to remain conscious for approximately 5 to 10 minutes after the wounds were inflicted.

Michigan State Police Detective Sergeant Michael Peterson testified that he investigated Wappner's death. After the discovery of Wappner's body, he visited Wappner's last known residence and spoke with Wappner's girlfriend, Shayla Wright. Upon interviewing Wright, Sergeant Peterson learned that Wappner had two cell phones, one of which he used for the sale of illegal drugs. Sergeant Peterson was able to track the location of Wappner's cell phones, which led him to Brian Walker, who was in possession of the cell phones and Wappner's vehicle.

Walker's statements led Sergeant Peterson to obtain surveillance video footage from the Bedford Inn, taken on the night of Wappner's death. The video was played for the jury and Sergeant Peterson narrated portions of the footage. According to Sergeant Peterson, the surveillance video showed that an individual driving a Chevy Avalanche arrived at the Bedford Inn at approximately 11:30 p.m. on December 2, 2018. Sergeant Peterson later determined that defendant owned a Chevy Avalanche.

While Sergeant Peterson was narrating the surveillance video, the prosecutor asked him, "Now this particular moment in time right here, does this later prove to be important in identifying defendant?" Sergeant Peterson responded, "Yes, sir, because you can see if you were to stop that, that it's a larger white male with a beard driving that vehicle and when we identified the – [defendant], [he] fit that description." The prosecutor later showed Detective Sergeant Peterson a still photograph of the individual driving the vehicle taken from the surveillance video footage. Sergeant Peterson stated that the photograph depicted "a larger white male with a beard driving that vehicle." The photograph was admitted as an exhibit. Sergeant Peterson went on to state that the surveillance video showed Wappner exit the Bedford Inn and enter the Chevy Avalanche on two occasions. On the second occasion, the Chevy Avalanche began to shake back and forth while Wappner was inside. Shortly after this occurred, the driver quickly left the parking lot with Wappner still inside the Chevy Avalanche.

Shayla Wright testified that she was dating Wappner before his death, and she admitted that Wappner made money by selling illegal drugs. According to Wright, when Wappner left home about one day before his death, he had between $400 and $500 in cash on his person, as well as powder cocaine, crack cocaine, marijuana, and ecstasy. Wright also testified that she recognized defendant because she had witnessed Wappner sell drugs to defendant and Morris on three prior occasions. According to Wright, on two of those occasions, defendant and Morris did not have enough money to complete the purchase from Wappner. On cross-examination, Wright testified that Wappner generally carried the drugs he was selling in his front pockets.

Walker also testified on behalf of the prosecutor. Walker stated that he arrived at the Bedford Inn with Wappner at about 11:30 p.m. on the night in question. After arriving at the Bedford Inn, Wappner went outside to sell cocaine to two individuals. Wappner returned shortly after doing so and told Walker that the individuals needed to retrieve money from a nearby ATM. At that time, Walker noticed that Wappner had about $200 cash in his pocket, along with a bag of cocaine approximately the size of a sandwich bag. Wappner left the room again but did not return. Walker waited for him until about 2:30 a.m., and then left the motel in Wappner's vehicle.

Sergeant Peterson testified further regarding his investigation into Wappner's death, and determined that defendant checked in to a Red Roof Inn at 1:23 a.m. on December 3, 2018. Sergeant Peterson obtained surveillance video footage from the Red Roof Inn which he described as showing defendant and another individual, who was later identified as Jessica Morris, leaving the Red Roof Inn on the morning of December 3, 2018, at 11:10 a.m. Sergeant Peterson determined that defendant and Morris then went to a nearby car wash. According to Sergeant Peterson, surveillance video footage from the car wash showed defendant spraying the inside of the Chevy Avalanche with water and washing the inside and outside of the vehicle for approximately one hour.

Sergeant Peterson testified that defendant and Morris also stayed at a Quality Inn in Findlay, Ohio between December 3, 2018 and December 5, 2018. Because the audio quality was poor, Detective Sergeant Peterson narrated surveillance video footage from the Quality Inn and stated that defendant can be heard arguing with an employee because the employee found a "burn hole" in a blanket in defendant's room.

After leaving the Quality Inn, defendant and Morris drove to Topeka, Kansas, where they sold Morris's cell phone. While driving through Logan County, Kansas, defendant and Morris were pulled over for a traffic stop. Sergeant Peterson obtained the body-camera footage from the officer who performed the traffic stop. According to Sergeant Peterson, defendant told the officer that he was driving to Denver, Colorado, to attend his aunt's funeral. Ultimately, the officer who performed the traffic stop gave defendant a warning for the alleged traffic violation.

On December 21, 2018, defendant and Morris were arrested in Aurora, Colorado, pursuant to arrest warrants that had been issued in relation to the investigation of Wappner's death. A police report from the Aurora Police Department stated that on December 22, 2018, defendant "wished to have photographs taken of some injuries he had." Defendant stated that he was attacked and bitten by a person on his right arm, back, and neck, and the injuries were related to "his case." When defendant was asked whether any other injuries needed to be photographed, defendant "spontaneously uttered[,] no, they were all on my right side. It all happened inside the car."

On cross-examination, Sergeant Peterson acknowledged that he was not able to identify defendant solely based upon the still photograph taken from the surveillance video footage at the Bedford Inn. Sergeant Peterson explained, however, that he identified defendant based on the totality of the circumstances as well as defendant's general characteristics and clothing.

After Sergeant Peterson's testimony concluded, Moises Paniagua testified on behalf of the prosecutor. Paniagua testified that he was employed as a maintenance worker at the Quality Inn in Findlay, Ohio in December 2018. At some point around December 5, 2018, Paniagua was asked to fix a clogged toilet in room 401 of the Quality Inn. Paniagua was able to fix the toilet and retrieved a cell phone from the inside of the toilet. Paniagua kept the cell phone for several days but ultimately gave it to Sergeant Peterson. When Paniagua's testimony concluded, the prosecutor called Sergeant Peterson as a witness for a second time. Sergeant Peterson testified that he retrieved the cell phone from Paniagua, and determined that it belonged to defendant.

Joni Johnson, a forensic scientist at the Michigan State Police forensic laboratory, testified as an expert in crime-scene processing and DNA analysis. Johnson searched the Chevy Avalanche, and photographed what appeared to be bloodstains on the driver's seat, behind the driver's seat, behind the front passenger seat, on the back seat, and on the ceiling of the vehicle. Johnson determined that the stains in the vehicle were likely caused by blood, and she sent the samples to the laboratory for DNA analysis.

Amber Smith, another forensic scientist for the Michigan State Police, also testified as an expert in crime-scene processing and DNA analysis. Smith collected and analyzed evidence found in the rooms where defendant and Morris were believed to have stayed in the Quality Inn and the Red Roof Inn. Smith collected samples of what appeared to be bloodstains that were found in those rooms. She testified that DNA from defendant and Morris was present in the samples taken from the Quality Inn. Smith also analyzed the blood samples that Johnson obtained from the Chevy Avalanche. Smith concluded that Wappner's DNA was present in three locations throughout the vehicle, and that DNA traces from defendant and Morris were present in a sample taken from the rear floor mat of the vehicle.

Rachael Starr, an intelligence analyst at the Michigan Intelligence Operations Center, was qualified as an expert witness in the analysis and mapping of cellular records, and she testified regarding defendant's cell phone records. Starr testified that, as part of the investigation into Wappner's death, she mapped the locations of defendant's cell phone and Morris's cell phone. She stated that, between 11:16 p.m. and 11:59 p.m. on the night of Wappner's death, the cell phones of both defendant and Morris connected to cellular towers near the Bedford Inn. Between 12:00 a.m. and 12:29 a.m. on December 3, 2018, the location of defendant's cell phone mimicked the location of Morris's cell phone. During this period, Morris's cell phone connected to a cellular tower near the location where Wappner's body was found. Starr stated that defendant's cell phone likely lost battery or was turned off after 12:30 a.m., because the cell phone did not connect to cellular towers between 12:30 a.m. and 3:29 a.m. Between 3:30 a.m. and 1:45 p.m., Morris's cell phone connected to a cellular tower near the Red Roof Inn. Between 1:46 p.m. and 2:59 p.m., Morris's cell phone connected to a cellular tower near the carwash where defendant washed his vehicle. At 5:25 p.m., defendant's cell phone connected to a cellular tower in Findlay, Ohio near the Quality Inn. Defendant's cell phone never connected to any additional cellular towers.

Michigan State Police Detective Sergeant Larry Rothman also testified on behalf of the prosecutor. On December 3, 2018, Sergeant Rothman searched the area surrounding the location where Wappner's body was found. Sergeant Rothman did not find any drugs, money, or weapons in the area. Sergeant Rothman searched the area surrounding the location where Wappner's body was found for a second time on December 4, 2018, and did not find any drugs, money, or weapons. Sergeant Rothman also searched defendant's vehicle in Aurora, Colorado. With the exception of some coins, Sergeant Rothman did not find any money in the vehicle.

The jury convicted defendant of first-degree felony murder, MCL 750.316(1)(b),[2] armed robbery, MCL 750.529, and unlawful imprisonment, MCL 750.349b. The trial court sentenced defendant, as a second-offense habitual offender, MCL 769.10, to life imprisonment without parole for first-degree felony murder, 300 to 600 months in prison for armed robbery, and 120 to 270 months in prison for unlawful imprisonment. This appeal followed.

## II. ANALYSIS

On appeal, defendant argues that he was denied a fair trial because Sergeant Peterson's testimony invaded the province of the jury, defense counsel was ineffective for failing to object to Sergeant Peterson's testimony that invaded the province of the jury, and there was insufficient evidence to support defendant's convictions for first-degree felony murder and armed robbery. We disagree with each of defendant's arguments.

### A. INVASION OF PROVINCE OF THE JURY

Defendant first argues that Sergeant Peterson improperly invaded the province of the jury when he offered his opinion that defendant was the person depicted in surveillance video footage taken at the Bedford Inn, the Red Roof Inn, and the car wash. Defendant also argues that Sergeant Peterson improperly invaded the province of the jury when he narrated surveillance video footage taken at the Quality Inn.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). During trial, defendant's counsel did not object to Sergeant Peterson's testimony concerning the surveillance video footage on the basis that the testimony invaded the province of the jury. Thus, this issue is unpreserved, and we review it for plain error affecting the defendant's substantial rights. See *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious,

---

[2] Defendant was charged with open murder under MCL 750.316, which includes first-degree felony murder. Although the felony information did not specifically list the predicate offenses, the trial court instructed the jury that the sole predicate offense for first-degree felony murder was armed robbery. Neither party raised any objection to the jury instruction regarding first-degree felony murder. Jurors are presumed to follow their instructions. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Thus, contrary to the prosecutor's assertion otherwise, the sole predicate offense for first-degree felony murder was armed robbery.

3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

MRE 701 permits a lay witness to provide testimony in the form of an opinion if the opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." MRE 701. A witness cannot, however, "express an opinion on the defendant's guilt or innocence of the charged offense." *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013) (cleaned up). For this reason, if a witness is in no better position than the jury to identify a defendant in a video or still photograph, the witness's opinion testimony identifying the person is generally inadmissible as an invasion of the province of the jury. *Id*. at 52-53. Conversely, if a witness is in a better position than the jury to identify a defendant in a video or still photograph, the witness's opinion testimony does not invade the province of the jury. *Id*. at 52.

## 1. THE BEDFORD INN

Defendant first challenges Sergeant Peterson's testimony concerning the surveillance video footage taken at the Bedford Inn.

While Sergeant Peterson was narrating the surveillance video footage taken at the Bedford Inn, the prosecutor asked, "Now this particular moment in time right here, does this later prove to be important in identifying defendant?" Sergeant Peterson responded, "Yes, sir, because you can see if you were to stop that, that it's a larger white male with a beard driving that vehicle and when we identified the – [defendant], [he] fit that description." The prosecutor later showed Sergeant Peterson a still photograph of the individual driving the vehicle taken from the surveillance video footage at the Bedford Inn, and Sergeant Peterson stated that the photograph depicted "a larger white male with a beard driving that vehicle." During this exchange, Sergeant Peterson did not definitively state that defendant was the individual depicted in the surveillance video footage. Instead, Sergeant Peterson stated that when defendant was later identified as a suspect, his characteristics matched those of the individual in the video. This testimony was properly admitted as lay witness testimony because it was rationally based on Sergeant Peterson's perception and was helpful to a clear understanding of how investigators ultimately identified defendant. Accordingly, plain error did not occur when Sergeant Peterson's testimony concerning the surveillance video footage taken at the Bedford Inn was presented at trial.

## 2. THE QUALITY INN

Next, defendant challenges Sergeant Peterson's testimony concerning the surveillance video footage taken at the Quality Inn on the basis that Sergeant Peterson invaded the province of the jury by narrating the video.

While Sergeant Peterson was narrating the surveillance video footage taken at the Quality Inn, he stated that there were angry discussions between defendant and an employee because of a burn hole found in a blanket in defendant's room. Defendant asserts that this testimony invaded the province of the jury because the jury was capable of viewing the video and gauging whether

any angry discussions occurred.[3]  Sergeant Peterson's testimony was rationally based on his perception of the video and was helpful to provide a clear understanding of the events that transpired at the Quality Inn.  Indeed, the prosecutor stated that the conversation was difficult to discern due to poor audio, and Sergeant Peterson's testimony provided context for the apparent disagreement.  Accordingly, a clear or obvious error did not occur when Sergeant Peterson's testimony concerning the surveillance video footage taken at the Quality Inn was presented at trial.

### 3.  THE RED ROOF INN AND THE CAR WASH

Further, defendant challenges Sergeant Peterson's testimony concerning the surveillance video footage taken at the Red Roof Inn and the car wash on the basis that Sergeant Peterson invaded the province of the jury by identifying defendant.  Although this testimony was improper, we conclude that the error did not affect the outcome of the proceedings.

While Sergeant Peterson was narrating the surveillance video footage taken at the Red Roof Inn, he specifically identified defendant as the individual checking in at the front desk.  Similarly, while the sergeant was narrating the surveillance video footage taken at the car wash, he specifically identified defendant as the individual washing the interior and exterior of a Chevy Avalanche for approximately one hour.  In contrast to his testimony concerning the surveillance video footage taken at the Bedford Inn, the sergeant definitively stated that defendant was the individual depicted in the surveillance video footage.  Considering that the videos were played for the jury at trial, the sergeant was in no better position than the jury to identify a person in the videos.  Thus, Sergeant Peterson's testimony invaded the province of the jury.

Nevertheless, the portions of Sergeant Peterson's testimony that invaded the province of the jury did not affect the outcome of the proceedings.  At trial, the prosecutor presented other evidence concerning defendant's whereabouts following Wappner's death that linked defendant to the crime.  Notably, the jury could have determined that defendant checked in at the Red Roof Inn and subsequently washed the interior and exterior of his vehicle based upon intelligence analyst Rachel Starr's testimony regarding the location of defendant's cell phone following Wappner's death and the surveillance video footage that depicted an individual matching defendant's description washing the same vehicle model that defendant owned and was found driving when he was arrested.  Moreover, the prosecutor presented evidence that defendant's and Morris's cell phones both connected to cellular towers near the Bedford Inn at the time Wappner was last seen alive.  Morris made several phone calls to Wappner during this period, and the surveillance video footage at the Bedford Inn depicted Wappner entering the same vehicle model that defendant owned and was found driving when he was arrested.  The video appeared to show the inside of the vehicle, and the prosecutor presented evidence that Wappner's DNA was later found in samples taken from what appeared to be blood stains in defendant's vehicle.  Further, Wappner's girlfriend testified that Wappner sold defendant and Morris drugs on three prior occasions.  On two of the occasions, defendant and Morris did not have enough money to purchase the drugs.  Lastly, bite marks on the right side of defendant's body were photographed by police

---

[3] Notably, defendant does not argue that Sergeant Peterson's identification of the individual in the surveillance video footage at the Quality Inn as defendant invaded the province of the jury.

after defendant's arrest, thereby indicating that defendant had been involved in a struggle. This evidence, coupled with defendant's apparent attempt to flee with Morris after Wappner's death, strongly supported the jury's verdict. Accordingly, the portions of Sergeant Peterson's testimony that invaded the province of the jury did not affect the outcome of the proceedings, and defendant has failed to establish plain error affecting his substantial rights.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that his trial counsel was ineffective for failing to object to the admission of Sergeant Peterson's testimony concerning the surveillance video footage. Defendant's argument is unpersuasive.

To preserve a claim for ineffective assistance of counsel for appellate review, a defendant must move in the trial court for a new trial or an evidentiary hearing, *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018), or file in this Court a motion for remand to the trial court for a *Ginther* hearing, *People v Abcumby-Blair*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347369); slip op at 6. Defendant did not move in the trial court for a new trial or an evidentiary hearing and did not file in this Court a motion to remand for a *Ginther* hearing. Thus, this issue is unpreserved.

This Court reviews unpreserved claims of ineffective assistance of counsel for mistakes that are apparent from the record. *Head*, 323 Mich App at 539. "Whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law." *People v Johnson*, 315 Mich App 163, 174; 889 NW2d 513 (2016). A trial court's findings of fact, if any, are reviewed for clear error, while questions of constitutional law are reviewed de novo. *Id*. A trial court's finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *People v Lopez*, 305 Mich App 686, 693; 854 NW2d 205 (2014).

A defendant seeking relief based upon a claim of ineffective assistance of counsel bears the burden of showing "(1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). "A counsel's performance was deficient if it fell below an objective standard of professional reasonableness. The performance prejudiced the defense if it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different." *People v Fyda*, 288 Mich App 446, 450; 793 NW2d 712 (2010). There is a strong presumption that counsel's conduct fell within a wide range of professional assistance. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002). Thus, defendant must overcome the strong presumption that the challenged action might be considered sound trial strategy. *Id*.

Initially, we conclude that defense counsel was not ineffective for failing to object to Sergeant Peterson's testimony concerning the surveillance video footage taken at the Bedford Inn and the Quality Inn. As explained earlier, this testimony did not invade the province of the jury and was admissible as lay witness testimony under MRE 701. Accordingly, any objection to its admission would have been meritless. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

-8-

Further, defendant's trial counsel was not ineffective for failing to object to Sergeant Peterson's testimony concerning the surveillance video footage taken at the Red Roof Inn and the car wash. Although trial counsel's performance was objectively deficient in this regard, it is not reasonably probable that, but for trial counsel's error, the result of the proceeding would have been different.

According to the prosecutor's theory of the case, defendant stabbed Wappner multiple times in defendant's vehicle and subsequently fled to the Red Roof Inn, after which he washed the interior and exterior of his vehicle at the nearby car wash. Sergeant Peterson's identification of defendant as the individual in the surveillance video footage may have made it more likely for the jury to identify defendant as the individual in the surveillance video footage and to accept the prosecutor's theory of the case. Thus, trial counsel's failure to object to the sergeant's identification of defendant as the individual in the surveillance video footage did not constitute sound trial strategy, and counsel's performance fell below an objective standard of professional reasonableness.

Nevertheless, it is not reasonably probable that, but for trial counsel's error, the result of the proceeding would have been different. The jury could have determined that defendant checked in at the Red Roof Inn and subsequently washed the interior and exterior of his vehicle based upon Starr's testimony regarding the location of defendant's cell phone, the surveillance video footage depicting the actions of an individual matching defendant's description, and the fact that defendant was found driving the same vehicle when he was arrested. Moreover, the prosecutor presented evidence that Wappner's DNA was later found in samples taken from what appeared to be blood stains in defendant's vehicle, and the bite marks on defendant's body indicated that defendant had been involved in a struggle. This evidence, coupled with defendant's apparent attempt to flee with Morris after Wappner's death, strongly supported the jury's verdict. Thus, it is not reasonably probable that, but for trial counsel's error, the result of the proceeding would have been different. For this reason, defendant's trial counsel was not ineffective for failing to object to Sergeant Peterson's testimony concerning the surveillance video footage taken at the Red Roof Inn and the car wash.

## C. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that there was insufficient evidence to support defendant's convictions for armed robbery and first-degree felony murder. This argument is without merit.

"This Court reviews de novo a defendant's challenge to the sufficiency of the evidence" supporting his conviction, reviewing the evidence "in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the prosecution proved the crime's elements beyond a reasonable doubt." *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019).

## 1. ARMED ROBBERY

Defendant argues that the prosecutor presented insufficient evidence to support his conviction for armed robbery because the prosecutor failed to establish that defendant committed

a larceny. To convict a defendant of armed robbery under MCL 750.529, it is necessary to establish the following:

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Gibbs*, 299 Mich App 473, 490-491; 830 NW2d 821 (2013) (cleaned up).]

The phrase "in the course of committing a larceny" includes "acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property." MCL 750.530(2). Although the armed-robbery statute does not define the term "dangerous weapon," MCL 750.529, knives are generally considered to be dangerous weapons. See *People v Banks*, 454 Mich 469, 473; 563 NW2d 200 (1997).

On appeal, defendant argues that the evidence presented at trial was too speculative to establish that a larceny occurred. Although the prosecutor presented little direct evidence establishing that defendant committed a larceny, he presented circumstantial evidence that defendant did so. When Wappner was last seen alive, he was in possession of drugs and at least $200 in cash. When Wappner's body was found the following day, his pockets were turned inside out, there were no drugs or cash found on his person, and his body was riddled with 20 stab wounds. This evidence, coupled with the evidence linking defendant to the crime, indicates that defendant took the money and drugs from Wappner by force while using a knife. "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Carines*, 460 Mich App at 757 (cleaned up). The prosecutor presented sufficient evidence to support defendant's conviction for armed robbery.

## 2. FELONY MURDER

Lastly, defendant argues that there was insufficient evidence to support his conviction for first-degree felony murder because there was insufficient evidence to support his conviction for the predicate offense of armed robbery.

At the outset, defendant only challenges the sufficiency of the evidence supporting the third element of first-degree felony murder. Thus, our analysis will be limited to the scope of defendant's argument. The elements of first-degree felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, and (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b). *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007). Larceny is a felony specifically enumerated in the statute. MCL 750.316(1)(b). Defendant has failed to show that there was insufficient evidence to support his conviction for first-degree felony murder. As previously stated, the prosecutor presented sufficient evidence to

support defendant's conviction for armed robbery, which requires a finding that a larceny occurred. For this reason, there was sufficient evidence to support defendant's conviction for first-degree felony murder.

Affirmed.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Brock A. Swartzle